ATLAS STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CLARKSBURG STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CLARKSBURG TERMINAL, INC., a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

EUREKA STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

FIDELITY STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

GENERAL STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

INLAND STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

MERCHANTS STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

OWENS STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

REX STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CANDO CORPORATION, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CHESAPEAKE STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CHESAPEAKE TERMINAL, INC., a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CHESTER CORPORATION, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

CORY CORPORATION, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

ODNAC CORPORATION, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

OHIO STORAGE COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

RYCO CORPORATION, a corporation,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 2649–2658, 2697–2704.

United States District Court
S. D. West Virginia,
Charleston Division.

Oct. 13, 1969.

William G. Johnson, Johnson & Johnson, Clarksburg, W. Va., for plaintiffs.

Myron C. Baum, Herbert S. Kendrick, Dept. of Justice, Washington, D. C., and Milton J. Ferguson, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

In these eighteen related actions, which were consolidated for trial and disposition, the plaintiff corporations seek the refund of income taxes and interest for the years 1956, 1957 and 1958 in the aggregate amount of $300,869.69.

The questions presented for disposition are as follows:

1. Whether, acting under the provisions of Section 269 of the Internal Revenue Code of 1954, the Commissioner of Internal Revenue properly disallowed surtax exemptions for the several taxpayer corporations with the exception of one corporation in each geographical area in which their operations were conducted upon the ground that the corporations were acquired for the principal purpose of evading or avoiding federal income taxes by securing benefit of deductions, credits or other allowances to which they would not otherwise have been entitled.

2. Whether the Commissioner of Internal Revenue properly reallocated the expenses of the several corporations pursuant to the provisions of Section 482 of the Internal Revenue Code of 1954.

3. Whether the adjustments made by the Commissioner in the deductions for depreciation were correct.

4. Whether or not certain expenditures for wiring and warehouse fixtures were deductible business expenses under Section 162 of the Internal Revenue Code of 1954 or capital expenditures which did not qualify for a deduction as provided in Section 263 of the Internal Revenue Code of 1954, but which should properly be the subject of a deduction for depreciation under the provisions of Section 167 of the Internal Revenue Code of 1954.

The eighteen plaintiff corporations constitute three geographical groups located in Charleston and Clarksburg in the State of West Virginia and in Columbus, Ohio. All eighteen corporations are engaged in the storage and warehouse business, were incorporated separately, and during the years here in question filed separate federal income tax returns.

The Charleston group consisted of the following corporations: Fidelity Storage Company incorporated in 1945, Merchants Storage Company incorporated in 1947, Atlas Storage Company incorporated in 1948, Inland Storage Company incorporated in 1950, Eureka Storage Company incorporated in 1952 and Rex Storage Company incorporated in 1955.

The Clarksburg group consisted of General Storage Company incorporated in 1946, Clarksburg Terminal, Inc. in-

corporated in 1952, Clarksburg Storage Company incorporated in 1953 and Owens Storage Company incorporated in 1954.

The Columbus group consisted of Chesapeake Storage Company and Ohio Storage Company incorporated in 1955, Cando Corporation and Odnax Corporation incorporated in 1956, Chesapeake Terminal, Inc., Chester Corporation, Cory Corporation and Ryco Corporation, all incorporated in 1957.

The capital stock of Fidelity Storage Company was originally owned by two brothers-in-law of William J. Maier, Jr., each of whom owned 10% thereof, and the remaining stock was owned by Mr. and Mrs. William J. Maier, Jr., with 12% and the Big Two Mile Gas Company, which owned the remaining 68%. It should be observed that Mr. and Mrs. Maier owned, either directly or indirectly, all of the capital stock of Big Two Mile Gas Company as well as Ajax Pipeline Company and, in turn, Big Two Mile owned all of the capital stock of the Shale Gas Company. The capital stock of the remaining seventeen taxpayer corporations was owned entirely by either Mr. and Mrs. Maier, one of the three foregoing gas companies, or one of the taxpayer corporations.

The capital structure of the corporations in the Columbus group provided for Class A and Class B capital stock at the time of incorporation. The capital stock of each corporation was $10,000, $3,000 thereof being Class A stock and $7,000 being Class B stock. The Class A stock alone was entitled to vote, but both classes of stock were to participate in all dividends either of earnings or liquidation with two exceptions, first, that dividends might be declared on Class A stock for the purpose of paying inheritance taxes of the holder of that stock without dividends being paid on the Class B stock, and second, dividends might be paid at any time on Class B stock without any dividends being paid at such time on the Class A stock. In the year 1958 the charters of all of the West Virginia corporations, except General Storage Company,

were amended to reclassify the capital stock with 30% designated as Class A and 70% designated as Class B with provisions and exceptions relative to dividends identical to those of the Ohio corporations. All of the Class B stock in the West Virginia corporations was issued in the name of a scholarship foundation set up by Mr. and Mrs. Maier.

The federal income tax returns of the taxpayers for the years 1956, 1957 and 1958 were timely filed. Subsequently the Commissioner of Internal Revenue assessed additional income taxes together with statutory interest which amounts were paid by each of the corporations. The taxpayers timely filed refund claims for these years, which claims were disallowed by the Commissioner and thereafter the present actions were instituted.

### Surtax Exemption Issue

The most important question in this litigation involves the action of the Commissioner in disallowing the surtax exemptions for the several taxpayer corporations pursuant to the provisions of Section 269 of the 1954 Code. As heretofore pointed out, the Commissioner permitted the exemption to stand for only one corporation in each of the geographical areas.

Section 11 of the 1954 Code imposed a tax on the taxable income of every corporation at a rate of 30% and an additional surtax of 22% on taxable income in excess of $25,000. The effect of this Code provision, of course, was to grant a surtax exemption for the first $25,000 of taxable corporate income. It was readily apparent that multiple corporations might be used in an attempt to minimize the tax liability of a single integrated business enterprise, and as one of the protections against such a manipulation, the Congress enacted Section 269 of the 1954 Code. This Section is entitled "Acquisitions made to evade or avoid income tax" and provided in pertinent part as follows:

"(a) In general.—If—

(1) any person or persons acquire, or acquired on or after October 8,

1940, directly or indirectly, control of a corporation, * * *

(2) * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * * (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

Section 269 is the successor to Section 129 of the Internal Revenue Code of 1939, and has remained essentially unchanged since its original enactment.

The requisite statutory control of the corporate taxpayers is not disputed in this litigation and it is now well settled that a newly organized corporation is an "acquired" corporation within the meaning of Section 269. See James Realty Co. v. United States, 176 F.Supp. 306 (D.Minn.1959) aff'd 280 F.2d 394 (8th Cir. 1960); Coastal Oil Storage Co. v. C. I. R., 242 F.2d 396 (4th Cir. 1957). It should further be observed that the burden rests upon the taxpayer to persuade the Court that the corporate arrangement here under consideration did not have tax avoidance as its principal purpose. J. T. Slocomb Co. v. C. I. R., 334 F.2d 269 (2d Cir. 1964); Kessmar Construction Co. v. C. I. R., 336 F.2d 865 (9th Cir. 1964). The question is a purely factual one to be determined upon all of the evidence in the case. Elko Realty Co. v. C. I. R., 260 F.2d 949 (3d Cir. 1958). In the light of these observations, it is appropriate to review the development and operational patterns of the corporate plaintiffs.

The principal executive officer and the architect of the corporate arrangement here under consideration is William Joseph Maier, Jr. Mr. Maier was educated in the law and actively engaged in the practice of his profession until about the year 1945. His father had been engaged in the storage business in Huntington, West Virginia, for many years, and in 1933 Mr. Maier and his father formed W. J. Maier Storage Company with operations in Huntington. In 1942 Mr. Maier took over the active management of that company with the assistance of his brothers-in-law. During World War II at the request of the Office of Defense Transportation, Maier formed the Federal Emergency Warehouse Association of West Virginia, and incident to this work he developed some rather progressive ideas relative to the warehouse business. It would serve no useful purpose in the context of this litigation to detail the warehouse methodology developed by Mr. Maier but, suffice it to say, he implemented these ideas quite successfully. In the year 1945 Maier entered into negotiations with the Dupont Company for 50,000 square feet of warehouse space in Charleston. Incident thereto he arranged for the purchase of one tract of land located on Pennsylvania Avenue in Charleston fronting 560 feet thereon and extending back some 399 feet. As heretofore stated, Maier incorporated Fidelity Storage Company in May of 1945 for the purpose of purchasing the tract from New York Central and building the warehouse to service the Dupont account. In addition to the capital stock of $100,000, a loan in the amount of $250,000 was obtained from The Kanawha Valley Bank. $125,000 of this loan was advanced incident to the construction of the first unit of 50,000 square feet, and the remaining $125,000 was advanced for the construction of a second unit of 50,000 square feet, this second unit having been built to service the needs of Carbide and Carbon Chemicals Corporation. The bank loan was secured by a deed of trust lien upon the entire property.

Incident to the purchase of the property on Pennsylvania Avenue, Maier was required to give assurance that the entire property would be developed by warehouse construction and Maier and his

wife personally agreed to guarantee such performance under a liquidated penalty of $30,000 in the event the agreement was not fulfilled. Accordingly, in 1947 Maier formed Merchants Storage Company for the purpose of constructing a warehouse with the capacity of 80,000 square feet upon the remainder of the property. Incident to the construction of this warehouse, Maier negotiated a loan from Union Central Life Insurance Company to Fidelity Storage Company in the amount of $432,000. Merchants was capitalized at $50,000, Maier and his wife purchasing $12,500 of the capital stock and his gas companies purchasing the remaining $37,500. Additionally, Ajax Pipeline Company made a loan to Merchants in the amount of $50,000. $250,000 of the Union Central loan was used to pay off the indebtedness at The Kanawha Valley Bank, $139,000 was advanced to Merchants for the warehouse construction and the remaining $43,000 was used by Fidelity for working capital.

The operations of Fidelity and Merchants were quite successful and in 1948 Maier formed Atlas Storage Company for the purpose of building a warehouse on property purchased from the Baltimore and Ohio Railroad Company and located at Spring and Bullitt Streets in Charleston. In financing this corporation Maier and his wife purchased $10,000 of the capital stock. General Storage Company which had been incorporated in 1946 advanced a loan of $20,000 and Merchants Storage advanced $20,000. Additionally, the gas companies owned by Maier together with General and Merchants advanced another $100,000 to finance the Atlas construction.

Soon thereafter in the year 1950 Maier formed Inland Storage Company for the purpose of building and operating a warehouse located at Young and Welch Streets in Charleston. In financing this company Maier and his wife purchased $5,000 of capital stock. General Storage purchased $10,000 of stock. Merchants Storage purchased $10,000 of stock. In addition thereto, Shale Gas, Big Two Mile Gas, Ajax Pipeline and General Storage advanced loans aggregating $102,500.

In the year 1952 the opportunity presented itself to Maier for the establishment of a relatively small mail order warehouse to serve either Montgomery, Ward and Company or Sears, Roebuck and Company, or both. A site was obtained at the intersection of Watts Street and Crescent Road in the City of Charleston, which was relatively close to a substation of the Charleston Post Office. To build and operate this facility Eureka Storage Company was incorporated on April 20, 1952, and Maier and his wife purchased $5,000 of capital stock in this corporation. In addition thereto General Storage Company, Shale Gas Company and Big Two Mile Gas Company advanced $65,000 in loans for the purchase of the land and the construction of the building by Eureka.

The warehouse space requirements of both Dupont and Carbide had increased substantially over the period subsequent to the formation of Fidelity, and Maier concluded that a site should be obtained for the purpose of accommodating all of the needs of one of these companies in one location. A desirable site for that purpose was owned by the New York Central Railroad located on Bigley Avenue in Charleston. To tie down the property for future use, Maier obtained a lease on this property at a nominal rate and on February 26, 1955, incorporated Rex Storage Company to hold the lease and operate this facility. Under the circumstances, it was necessary to pay in and issue only $1,000 of capital stock which stock was purchased by Maier. The old New York Central shop building on the property was used by Rex to accommodate overflow storage for two chemical companies, Westvaco and Barium.

The Clarksburg warehouse group had its genesis in the W. J. Maier Storage Company which, as heretofore stated, was originally owned and operated by Mr. Maier's father. The Maier Storage Company was operating a warehouse at Clarksburg, West Virginia, in a building

which it leased from Keely Construction Company. Mr. Maier and his father were in disagreement over the advisability of continuing the Clarksburg operation and, accordingly, in 1946, Mr. Maier formed General Storage Company to take over the operation of the Maier Storage Company facility at Clarksburg. Incident to the formation of General Storage, the Keely lease was assigned to it from Maier Storage Company. In June of 1947 General obtained a new lease from Keely for a period of five years. In the summer of 1952 the Clarksburg building and its contents were destroyed by fire which gave rise to prolonged and expensive litigation between General and the United States Government. Prior to the fire, General had obtained a five-year renewal of the Keely building lease, but in the meantime Maier had negotiated for the purchase of a tract of approximately eight acres immediately adjacent to the Keely property. General's warehousing operations had come to a standstill due to the fire and ensuing litigation, and on September 4, 1952, Clarksburg Terminal, Inc., was formed. Maier and his wife purchased $5,000 of capital stock in this corporation and Shale Gas Company and Ajax Pipeline Company advanced $70,000 in loans. In the following year 1953, however, the loan indebtedness of Clarksburg Terminal had increased to $187,500, $125,000 having been advanced by Fidelity and the remaining $62,500 having been advanced by Shale Gas Company. The money advanced by Fidelity was obtained by it on a loan from The Kanawha Valley Bank, Fidelity in turn advancing the money to Clarksburg Terminal and pledging the notes of that corporation to the Bank to secure the Fidelity loan.

While the Clarksburg Terminal building was under construction, it appeared advantageous to construct an adjacent warehouse to utilize a common party wall with Clarksburg Terminal. Accordingly, on July 8, 1953, Clarksburg Storage Company was formed to build this additional warehouse facility. Maier and his wife purchased $5,000 capital stock in Clarksburg Storage Company and an additional $158,000 in loans was advanced by Shale Gas Company, Big Two Mile Gas Company and Ajax Pipeline Company.

In early 1954, Owens Illinois Glass Company advised Maier that they desired additional warehouse space which could be accommodated by the erection of a prefabricated steel building. Accordingly Owens Storage Company was incorporated on August 31, 1954, and, again, Maier and his wife purchased the outstanding capital stock in the amount of $5,000. In addition thereto loans in the total amount of $109,750 were advanced to Owens Storage by Shale Gas Company, Big Two Mile Gas Company and Ajax Pipeline Company.

The Columbus warehouse group is located on a tract of 12.7 acres of land located less than a mile from the center of the City and purchased by Maier from the Chesapeake & Ohio Railway Company in 1954. A unique warehouse plot plan was prepared by an architect, Glenn C. Hancock, and was designed to utilize effectively common party walls, loading docks, driveways and railway spurs. The first corporation in this group was Chesapeake Storage Company which was incorporated on January 7, 1955. As heretofore pointed out, the capital structure of all of the corporations in the Columbus group provided for Class A and Class B capital stock. In financing Chesapeake Storage Company, Maier and his wife purchased the $3,000 of Class A stock, and Fidelity, Merchants, Atlas, Inland and the three gas companies, Shale, Big Two Mile and Ajax Pipeline purchased the $7,000 of Class B stock. In addition to the capital stock, loans aggregating $206,500 were advanced by Fidelity, Merchants, Rex Inland, Shale Gas, Big Two Mile Gas, Ajax Pipeline and Maier, himself, although Maier's participation therein was limited to only $500.

Ohio Storage Company was incorporated on September 12, 1955, and the capital stock participation was comparable to that of Chesapeake Storage. Addition-

ally, Ohio Storage obtained loans aggregating $158,500 advanced by Fidelity, Merchants, Rex, Atlas, Inland, General, the three gas companies and Maier personally.

The third unit in the Ohio group, Cando Corporation was incorporated on February 28, 1956, Maier and his wife purchasing the Class A stock in this corporation, and other corporations controlled by Maier purchasing the outstanding Class B stock. Additional financing for Cando in the total amount of $181,000 was obtained by loans from Merchants, Big Two Mile Gas Company, General Corporation and W. J. Maier Storage Company.

On June 5, 1956, Odnac Corporation was incorporated, the Class A and Class B stock being purchased by the same parties and under an arrangement similar to Cando and the other Ohio corporations. In addition to the equity capital, Odnac obtained $187,700 through loans from Rex, Inland, General Storage Company, Shale Gas Company, Ajax Pipeline Company and Maier personally.

On January 3, 1957, two more companies were added to the Ohio group through the incorporation of Chesapeake Terminal, Inc., and Chester Corporation. The stock was issued on a basis similar or identical to the other Ohio corporations. Chesapeake Terminal, Inc., obtained $159,000 from Fidelity Storage Company, Merchants, General Storage Company, Chester Corporation, Big Two Mile Gas Company, Ajax Pipeline Company and General Corporation. Chester Corporation obtained a loan in the amount of $156,000 from Fidelity Storage Company.

The final two warehouses in the Ohio project were constructed by Cory Corporation and Ryco Corporation both of which were incorporated on May 7, 1957, with the stock issued to the parties and in a manner similar to the other Ohio companies. Cory obtained loans aggregating $171,500 from Merchants, General Storage Company, Shale Gas Company, Big Two Mile Gas Company and Ajax Pipeline Company. Ryco obtained loans totalling $106,000 from Merchants, Atlas, Eureka, Inland, General Storage and Shale Gas Company.

From the foregoing it is readily apparent that aside from the financing for the first three warehouse units here involved, all subsequent capital for warehouses, in the three groups was provided by a combination of Mr. and Mrs. Maier individually, their wholly owned gas companies and the various taxpayer corporations either through the purchase of stock or loans. Additionally, it should be noted that all financing from sources other than the companies controlled by Mr. and Mrs. Maier was initiated by and passed through Fidelity Storage Company.

It is also significant that in this pattern of intercompany financing in most instances there was no interest charged for these loans between the several companies. Additionally, even though the intercompany indebtedness was evidenced by demand notes, on several occasions one of the taxpayers would make a loan to another of the corporations while it had a note payable outstanding to a third company in the taxpayer group. A notable exception to the practice of these interest-free loans were those from General Storage Company to the various taxpayers during the period of time between its fire in 1952 and its active resumption of warehouse business in 1959. These loans yielded General Storage 6% interest which was a higher rate than the borrowing taxpayers would have been required to pay in the open market, and on many occasions some of the taxpayers were paying 6% interest to General Storage at a time when they had outstanding loans to other taxpayers upon which they were receiving no interest income whatsoever. This pattern of intercompany financing in itself is a strong indication that the three taxpayer groups were operated and financed as a single integrated business enterprise.

In addition to the foregoing pattern of intercompany financing, the operational routine of the several taxpayers

indicates that each of the three geographical groups conducted a single integrated business enterprise. The cash journals and ledgers for all of the taxpayers were kept at the office of Fidelity Storage Company in Charleston and payroll checks and all bank deposits were prepared in that office by Mrs. Lolita Bangert. Except for a small account of Clarksburg Terminal, the bank accounts for both the Clarksburg and Charleston operations were maintained in Charleston and invoices for both of these groups were also prepared in Charleston. All employees of the Charleston group were employed by Fidelity, Atlas, or Merchants, and in Clarksburg the only taxpayer which had any employees was Clarksburg Terminal, Inc.

In the method of operation of the taxpayers only the taxpayer corporation which contracted with a particular customer received handling income pursuant to the warehouse agreement regardless of the actual warehouse in which the subject goods was stored. In Charleston during the period in question only Atlas and Fidelity had employees for the purpose of handling merchandise. If goods was stored in the facility of one of the corporations which had no handling service force, the customer was referred to either Fidelity or Atlas to arrange for such service. In such event the billing for both storage and handling charges was rendered in the name of the particular corporation which contracted with the customer for storage space, all such statements, however, being prepared by an employee of Fidelity Storage Company. In those instances where services were performed by employees of Fidelity or Atlas, an adjustment was made between the taxpayers for such services on an intercompany basis. Additionally, for example, Fidelity on a number of occasions contracted for more storage space than it had available in its own warehouses, and in such instances in its contract with a customer it committed space in the warehouse of Eureka. The handling income incident to such a contract was received by Fidelity under the warehouse agreement regardless of the fact that the merchandise was actually stored in the warehouse of another corporation. In the Clarksburg group the only taxpayer receiving handling income was Clarksburg Terminal, Inc., and this was the only corporation in that group which entered into contracts or received any payment for customers of the group. Routinely there was no written contract between the corporation with which merchandise was actually stored and the corporation which contracted with the customer, and this operational method was followed not only in Charleston but also in Clarksburg and Columbus.

In the Columbus group only Chesapeake Storage Company had any employees and it was the only taxpayer in that group which received any income for handling services. The office for the operation of all of the Columbus warehouses was maintained by Chesapeake Storage Company. Chesapeake Storage Company consistently contracted for space in the warehouses of other corporations in the group without specifying the corporate owner of the storage facility. In Columbus the only telephone lines for the taxpayers were located in the office of Chesapeake Storage Company and were listed only in the name of that taxpayer. Likewise, the telephone directory in Clarksburg listed only Clarksburg Terminal, Inc. In Columbus the advertising of Chesapeake Storage Company indicated that it controlled and had available for its use the aggregate storage space of all of the taxpayers located in that City.

As a result of this operational pattern many of the taxpayers generated no income except that which resulted from storage which was channelled to them by another corporation in the three groups. It is clear that in the Charleston Group Inland, Eureka and Rex primarily handled only overflow business from Atlas and Fidelity. Under the circumstances, all of the income re-

ceived by Rex Storage Company during the years here in question was intercompany income distributed to it from Atlas, and similarly in the year 1958 the entire gross receipts of Eureka consisted of intercompany income received from other members of the Charleston group. In Clarksburg such intercompany income accounted for the entire gross receipts for Owens Storage Company in 1956, and for General Storage and Owens as well in the years 1957 and 1958. In Columbus the entire gross income of Ohio Storage Company during the years here in question represented intercompany income distribution from Chesapeake Storage Company. With one exception in 1957, all of the intercompany income received by the Columbus taxpayers was paid to them by Chesapeake Storage Company.

There is attached hereto as part of the appendix of this opinion Government Exhibits Nos. 20, 21 and 22 which graphically illustrate the handling of intercompany income for each of the three groups during the years in question in this litigation. These exhibits demonstrate an interrelationship and dependency of one taxpayer upon another in each of the geographical areas and a unity of enterprise which supports the Commissioner's conclusion that each of the three groups was, in effect, conducted as a single integrated warehouse business.

The utilization of management personnel is also significant. As heretofore pointed out Mrs. Lolita Bangert was employed by Fidelity in Charleston and while she testified that she spent approximately half of her time on the work of Fidelity, admittedly she performed services for all of the taxpayer corporations. Mr. Ted R. Mann was employed as general manager of Fidelity, a position that was nonexistent in any of the other Charleston corporations. While Mr. Mann gave no definitive breakdown, it appears that he, like Mrs. Bangert, performed services incident to the operations of the other Charleston

companies. In Clarksburg Mr. Armin T. Williams was employed by Clarksburg Terminal, Inc., and, of necessity, the services rendered by him inured to the benefit and served the remaining companies in the Clarksburg group. James H. Thompson was initially employed by Fidelity in Charleston as a customers' relations man, but as time went on he devoted the greater part of his time to Chesapeake Storage Company in Columbus. Ultimately, he was appointed general manager of the Chesapeake Storage Company although his salary was paid by Fidelity. From the record it would appear that Mr. Thompson solicited business generally for all of the taxpayers including those in the Columbus group.

The evidence clearly indicates that the physical operation and designation of the several taxpayers in the three groups were to a large degree interrelated and integrated. The pallet supplies used in the warehouse operations were treated as a common pool. The warehousing facilities on Bigley Avenue in Charleston were designated as Units 1, 2 and 3 although Fidelity was the owner of the first two units and Merchants was the owner of Unit 3. The Clarksburg operations were also identified by unit numbers despite the fact that they were owned by separate corporate entities. In Columbus the warehouses were also identified by unit numbers and the various bays identified by alphabetical letters which covered the entire warehouse complex. The unique arrangement of the Columbus complex permitted fork lift trucks to be driven from one facility to another inside the overall building, and through the use of mutual easements and driveways, railroad and trucking loading and unloading operations were permitted to serve the entire complex. One railroad sidetrack accommodated four of the taxpayers and another accommodated all eight of the Columbus taxpayers although only Chesapeake Storage Company had a siding agreement with the Chesapeake & Ohio Railway Company.

The effectiveness of these operating procedures of the several taxpayer corporations in consistently obtaining the maximum benefit of the surtax exemption is clearly demonstrated by an examination of their net taxable income in relation to their respective gross receipts not only for the years here in question, but for the preceding years as well. Though the gross receipts vary from year to year and by corporation, the taxable income reported by the Charleston companies shows a definite pattern in which such income remained at or near the critical surtax figure of $25,000. As one example, in the year 1947 Fidelity reported a taxable income of $24,897.66 upon gross receipts of $138,336.07. In 1951 Fidelity's gross receipts had increased to $177,401.95 yet its taxable income was only $24,715.02. During the years in question Fidelity's gross receipts fluctuated between $283,596.46 and $291,652.25 yet the taxable income for those years remained between $24,816.76 and $24,878.85. This consistency of net income less than the surtax exemption figure despite the dramatic increase in gross receipts for these years would appear to be more than merely coincidental. With few exceptions, the remaining Charleston taxpayers consistently reported net taxable income which fell within the amount of the surtax exemption regardless of substantial variations in gross receipts. These somewhat extraordinary figures of the Charleston companies are demonstrated by Defendant's Exhibits 1 through 6, inclusive, attached as a part of the appendix to this opinion. In Clarksburg a similar pattern of stable taxable income which consistently fell within the surtax exemption despite variations in the gross receipts of the several companies is clearly demonstrated by the evidence. This pattern of advantageous tax consequences is illustrated in Defendant's Exhibits 7 through 10, inclusive, attached as a part of the appendix to this opinion. In Columbus not one of the taxpayers ever reflected taxable income in excess of the surtax exemption. As one example, in the year 1957 Chesapeake Storage Company reported taxable income of $24,043.44 upon its gross receipts of $104,436.60 yet during the same year Ohio Storage Company reported taxable income of $22,060.38 on gross receipts of only $31,633.82. The gross receipts and taxable income figures for the Ohio group are illustrated by Defendant's Exhibits 11 through 13, inclusive, attached as a part of the appendix to this opinion. The foregoing evidence is highly persuasive, if indeed not conclusive, that the principal purpose of this corporate arrangement of the taxpayers was to avoid federal income taxes by securing the benefit of the surtax exemption. However, Mr. Maier, as chief executive officer of the taxpayer corporations, contended that the tax advantages were merely incidental to the other advantages and legitimate business purposes of this multicorporate complex. He suggested that these advantages were as follows:

(1) To give each corporation a separate and distinctive business identity which would be well recognized by prospective customers. As an example of this facet of the arrangement he pointed out that in Charleston Fidelity achieved an identity as a chemical storage facility; Merchants achieved the identity as a merchandising warehouse; and Atlas achieved its identity as a warehouse specifically designed to handle merchandise distribution. He also pointed out that in the Clarksburg group the Owens warehouse was identified with the glass industry.

(2) To develop an operating identification and affiliation between the various warehouses and the rail carriers serving a particular area. The evidence in this regard has already indicated that in Charleston certain of the warehouses were located upon the lines of the New York Central, others on the Baltimore & Ohio and others on the Chesapeake & Ohio Railway. In Columbus, of course, all of the warehouses were serviced by the Chesapeake & Ohio.

(3) To facilitate and obtain economical financing. With respect to this advantage Mr. Maier pointed out that Fidelity had established a line of credit with The Kanawha Valley Bank at a prime interest rate which it was able to utilize for the advantage of all of the corporations by collateralizing loans with their corporate notes. Maier further indicated that since the multiplicity of corporations furnished acceptable security, he had no hesitancy in placing his personal endorsement upon certain notes when he was called upon to do so by the Bank.

(4) To spread the risk of warehouseman's liability in the event of fire or other catastrophe and to provide a maximum insulation to such liability limited to the resources of the respective corporations in the three groups.

■■■ In regard to the fourth advantage suggested by Mr. Maier it occurs to me that the organization and operational procedures of the taxpayers might well subject all of the companies within a geographical area to the exposure of litigation and warehouseman's liability. In any event, however, even if it be conceded that the advantages itemized by Maier were legitimate business purposes for this corporate arrangement, they are not sufficient to carry the day for the taxpayers in this litigation in the light of the overwhelming evidence of the tax advantages obtained thereby. It is not necessary under the statute that tax avoidance be the sole purpose of the arrangement, but only that it be the "principal purpose." See J. T. Slocomb Co. v. C. I. R., *supra*. As heretofore pointed out, the burden rests upon the taxpayer to show that such avoidance was not the principal purpose of the acquisition, and under the evidence in this case, it is my conclusion that the taxpayers have failed to carry that burden. Accordingly, it is my further conclusion that the taxpayer corporations were acquired for the principal purpose of evading or avoiding federal income taxes within the meaning of Section 269 of the Internal Revenue Code of 1954 and that the Commissioner of Internal Revenue properly disallowed the surtax exemption for the several taxpayer corporations except for one corporation in each of the three geographical areas.

### Expense Allocation Issue

■■ Acting pursuant to Section 482 of the Internal Revenue Code of 1954, the Commissioner allocated the expenses of the various corporations among all of the taxpayers which he concluded had derived a benefit from the expenditures. In view of the conclusions reached by me in regard to the surtax exemption issue, this issue of administrative allocation is probably now academic. In any event, however, my review and observations of the evidence relative to the operation of the several taxpayers justifies the conclusion on my part that the Commissioner acted correctly in his allocation of these various business expenses which were deductible under Section 162 of the Code. The purpose of Section 482 is, of course, to place a controlled taxpayer on a parity with an uncontrolled taxpayer with respect to the allocation of deductible business expenses. In this regard the Commissioner has been granted "broad discretionary powers in the application of this provision of the statute and his determination can be set aside only if shown to be arbitrary and unreasonable." Leedy-Glover Rlty. & Ins. Co. v. C. I. R., 13 T.C. 95, 107, aff'd per curiam, 184 F.2d 833 (5th Cir. 1950). As heretofore stated, it is my conclusion that the Commissioner acted reasonably in his allocation of the expenses in the present case.

### Depreciation Issue

■■ The Commissioner saw fit to make certain adjustments in the depreciation schedules of the warehouses and other facilities of the taxpayer corporations. In Charleston, with the exception of Rex Storage Company, the warehouses were adjusted from a useful life of 30

years to 50 years except Inland Storage Company which was adjusted to 45 years. In Columbus all of the warehouses were adjusted from a useful life of 30 years to a life of 45 years. In Clarksburg the warehouses were adjusted from 30 years to 45 years with the exception of the steel building of Owens Storage Company which was adjusted from a 15-year useful life to 25 years. Certain sprinkler systems were adjusted from 10 years to 20 years and the same adjustment was made with respect to the railroad sidings.

The purpose of the depreciation deduction granted by the Internal Revenue Code is, of course, to provide an allowance to the taxpayer which will enable it to recover the cost of a capital asset over the period of its useful life. The deduction should properly be established in such a manner that the aggregate of the amounts deducted each year over the useful life of the property plus the salvage value at the end thereof equal the cost of the property. In other words, depreciation is designed to effect a "gradual sale" of the depreciated asset. See Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603; United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054. Expert witnesses testified on behalf of both the Government and the taxpayers in regard to their respective positions on the depreciation schedules in this case. It would serve no useful purpose to engage in an extensive review of their evidence on the various elements considered by them in arriving at their conclusions. It occurs to me, however, that when the totality of the evidence is viewed in the light of the unique and relatively single purpose of the taxpayers' facilities the depreciation schedules submitted by the taxpayers are much more realistic than the adjustments made by the Commissioner. The taxpayers are engaged in a business that is subject to rapid change both in the technology of the industry itself as well as the general merchandise distribution of this geographical area. We have seen in the past few years dramatic changes in methods of distribution by truck and by rail and in the handling of cargo as evidenced by the new concept of "containerized" shipments. It would be impossible at this point to state what impact these changes might have upon the industry in which the taxpayers are engaged, but in any event, it is my conclusion that the depreciation schedules submitted by the taxpayers are realistic and reasonable and that the Commissioner's adjustments in these depreciation deductions are not supported by the evidence in this case.

### Fixture Capitalization Issue

In the year 1956, Fidelity Storage Company expended the amount of $5,023.55 for electrical wiring and warehouse fixtures and in the year 1957, Merchants Storage Company expended the amount of $1,581.02 for similar expenditures. The taxpayers treated these expenditures as repairs and contend that they were entitled to deduct them as ordinary and necessary business expenses incurred during the two years in question pursuant to Section 162 of the Internal Revenue Code of 1954. The Government, however, contends that these expenditures were made for nondeductible permanent improvements which under Section 263 of the 1954 Code should have been capitalized and recovered through appropriate depreciation deductions.

In determining whether an expenditure is a deductible business expense under Section 162, or should be treated as a capital expenditure under Section 263, certain criteria have been established. If the expenditure is made for the acquisition of an asset that has a useful life in excess of one year, it is normally treated as a capital expenditure and cannot be deducted as a business expense. On the other hand, if the asset so acquired has a useful life of less than one year its cost is ordinarily deductible under Section 162. Tidwell v. C. I. R., 298 F.2d 864 (4th Cir. 1962). Additionally, if the expenditure prolongs the life or increases the value of such property,

it is generally treated as a capital expenditure. See Denver & Rio Grande Western Railroad Co. v. C. I. R., 279 F.2d 368 (10th Cir. 1960). From the evidence it appears that the principal reason for these expenditures was to obtain additional clearance in the two warehouses to accommodate the stacking height required by the development of what has been termed the Truni-Pac unitized load. While it is true that to some degree these expenditures covered repairs to conduits and lights which had been damaged incident to the operation of the warehouse, Mr. Maier admitted that the changes for which these expenditures were made was to permit additional stacking height to accommodate the new unitized load procedure. Under these circumstances, it clearly appears that the expenditures for these alterations had a useful life in excess of one year and also increased the value of the warehouses by permitting the increased stacking height for storage. Accordingly, the Commissioner acted properly in treating these expenditures as capital improvements under Section 263 and denying their deduction as business expenses under Section 162.

The foregoing opinion disposes of the issues presented in this litigation, and will be filed in lieu of findings of fact and conclusions of law under Rule 52, F.R.Civ.P. Counsel may prepare an appropriate judgment order incorporating this opinion by reference therein.

APPENDIX TO OPINION

Atlas Storage Company et al. v. United States

DEFENDANT'S EXHIBIT NO. 1

SCHEDULE OF AMOUNTS REPORTED ON THE INCOME TAX RETURNS FILED FOR FIDELITY STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|---|---|---|
| 1946 | $ 7,146.13 | $ 33,543.11 |
| 1947 | 24,897.66 | 138,336.07 |
| 1948 | 24,798.47 | 160,328.24 |
| 1949 | 22,954.55 | 141,356.37 |
| 1950 | 24,380.80 | 156,051.86 |
| 1951 | 24,715.02 | 177,401.95 |
| 1952 | 23,629.16 | 137,219.80 |
| 1953 | 24,236.49 | 159,641.83 |
| 1954 | 33,100.36 | 196,843.86 |
| 1955 | 38,353.42 | 237,849.28 |
| 1956 | 24,816.76 | 291,652.25 |
| 1957 | 24,878.85 | 283,596.46 |
| 1958 | 24,877.79 | 284,294.12 |

DEFENDANT'S EXHIBIT NO. 2

SCHEDULE OF AMOUNTS REPORTED ON THE INCOME TAX RETURNS FILED FOR MERCHANTS STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|---|---|---|
| 1947 | –0– | –0– |
| 1948 | $24,901.28 | $65,775.56 |
| 1949 | 23,976.29 | 63,753.97 |
| 1950 | 24,826.02 | 56,441.60 |
| 1951 | 24,715.02 | 55,415.62 |
| 1952 | 21,295.94 | 50,516.86 |
| 1953 | 22,893.90 | 50,725.52 |
| 1954 | 27,374.80 | 56,365.97 |
| 1955 | 27,995.17 | 64,553.66 |
| 1956 | 25,040.96 | 67,487.82 |
| 1957 | 25,074.63 | 69,650.62 |
| 1958 | 15,633.45 | 74,259.21 |

DEFENDANT'S EXHIBIT NO. 3

SCHEDULE OF AMOUNTS REPORTED ON THE INCOME TAX RETURNS FILED FOR ATLAS STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|---|---|---|
| 1948 | –0– | –0– |
| 1949 | $23,345.64 | $ 30,471.09 |
| 1950 | 23,363.37 | 54,818.72 |
| 1951 | 24,948.32 | 74,587.12 |
| 1952 | 20,813.51 | 75,527.02 |
| 1953 | 23,082.83 | 74,977.46 |
| 1954 | 28,485.60 | 101,686.59 |
| 1955 | 25,814.19 | 83,712.99 |
| 1956 | 24,269.01 | 62,432.48 |
| 1957 | 24,989.01 | 59,984.35 |
| 1958 | 24,763.29 | 75,529.50 |

DEFENDANT'S EXHIBIT NO. 4

SCHEDULE OF AMOUNTS REPORTED ON THE INCOME TAX RETURNS FILED FOR INLAND STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|---|---|---|
| 1950 | –0– | –0– |
| 1951 | $24,883.92 | $28,090.06 |
| 1952 | 18,941.07 | 30,475.71 |
| 1953 | 21,797.44 | 31,170.60 |
| 1954 | 24,962.67 | 32,865.64 |
| 1955 | 25,269.18 | 34,159.40 |
| 1956 | 24,965.27 | 35,157.10 |
| 1957 | 25,150.17 | 34,304.70 |
| 1958 | 24,954.67 | 36,494.32 |

DEFENDANT'S EXHIBIT NO. 5

SCHEDULE OF AMOUNTS REPORTED ON THE INCOME TAX RETURNS FILED FOR EUREKA STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|---|---|---|
| 1952 | $21,732.10 | $24,821.10 |
| 1953 | 24,346.70 | 36,997.03 |
| 1954 | 25,045.32 | 31,845.99 |
| 1955 | 24,860.10 | 29,753.03 |
| 1956 | 25,010.37 | 30,954.29 |
| 1957 | 25,497.03 | 31,202.02 |
| 1958 | 23,647.57 | 30,436.40 |

DEFENDANT'S EXHIBIT NO. 6

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
REX STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1955 | $25,554.37 | $26,381.26 |
| 1956 | 24,974.91 | 25,874.98 |
| 1957 | 25,087.78 | 26,461.65 |
| 1958 | 3,286.86 | 3,612.00 |

DEFENDANT'S EXHIBIT NO. 10

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
OWENS STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1954 | –0– | –0– |
| 1955 | $25,829.15 | $39,071.64 |
| 1956 | 25,005.05 | 42,926.00 |
| 1957 | 25,061.03 | 43,295.60 |
| 1958 | 24,542.96 | 41,087.00 |

DEFENDANT'S EXHIBIT NO. 7

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
GENERAL STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1948 | $21,575.88 | $ |
| 1949 | 24,952.55 | 55,167.28 |
| 1950 | 23,773.77 | 45,239.11 |
| 1951 | 24,854.72 | 78,838.06 |
| 1952 | 23,968.10 | 68,015.50 |
| 1953 | 623.60 | 20,021.50 |
| 1954 | 2,905.84 | 15,350.19 |
| 1955 | 11,563.53 | 20,996.00 |
| 1956 | 24,964.04 | 28,092.33 |
| 1957 | 23,695.23 | 36,558.16 |
| 1958 | 1,931.05 | 4,752.00 |

DEFENDANT'S EXHIBIT NO. 11

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
CHESAPEAKE STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1956 | $15,919.85 | $ 70,961.85 |
| 1957 | 24,043.44 | 104,436.60 |
| 1958 | 5,527.97 | 97,971.49 |

DEFENDANT'S EXHIBIT NO. 12

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
OHIO STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1955 | –0– | –0– |
| 1956 | $21,914.40 | $29,497.99 |
| 1957 | 22,060.38 | 31,633.82 |
| 1958 | 15,249.08 | 25,381.20 |

DEFENDANT'S EXHIBIT NO. 8

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
CLARKSBURG TERMINAL, INC.

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1952 | –0– | –0– |
| 1953 | $11,513.46 | $ 22,281.18 |
| 1954 | 25,216.77 | 80,189.96 |
| 1955 | 25,452.07 | 89,878.72 |
| 1956 | 24,998.95 | 104,869.06 |
| 1957 | 24,973.82 | 127,311.51 |
| 1958 | 24,882.21 | 158,151.15 |

DEFENDANT'S EXHIBIT NO. 13

SCHEDULE OF AMOUNTS REPORTED ON
INCOME TAX RETURNS

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| CANDO CORPORATION | | |
| 1956 | –0– | –0– |
| 1957 | $18,322.83 | $28,933.82 |
| 1958 | 18,320.86 | 31,966.16 |
| CHESTER CORPORATION | | |
| 1957 | 12,683.95 | 17,969.72 |
| 1958 | 22,505.20 | 42,000.00 |
| ODNAC CORPORATION | | |
| 1957 | 21,092.80 | 28,726.95 |
| 1958 | 23,627.25 | 32,939.50 |
| CHESAPEAKE TERMINAL, INC. | | |
| 1957 | 12,673.03 | 17,969.72 |
| 1958 | 21,121.30 | 42,000.00 |
| CORY CORPORATION | | |
| 1958 | 21,787.60 | 25,738.37 |
| RYCO CORPORATION | | |
| 1958 | 16,129.61 | 19,609.36 |

DEFENDANT'S EXHIBIT NO. 9

SCHEDULE OF AMOUNTS REPORTED ON
THE INCOME TAX RETURNS FILED FOR
CLARKSBURG STORAGE COMPANY

| YEAR | NET (TAXABLE) INCOME | GROSS RECEIPTS |
|------|------|------|
| 1953 | –0– | –0– |
| 1954 | $26,132.18 | $34,121.50 |
| 1955 | 25,929.13 | 33,826.12 |
| 1956 | 24,980.50 | 33,883.00 |
| 1957 | 24,839.16 | 35,446.50 |
| 1958 | 24,582.19 | 34,096.00 |

DEFENDANT'S EXHIBIT NO. 20
SCHEDULE OF INTERCOMPANY INCOME
CHARLESTON, W. VA., GROUP

| Receiving Company | Net (Taxable) Income Per Return | Gross Receipts Per Return | Total Intercompany Income | PAYING COMPANY | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Fidelity Storage Co. | Atlas Storage Co. | Inland Storage Co. | Atlas Storage Handling | Fidelity Storage Handling | Clarksburg Terminal Handling |
| **Year Ended 12/31/56:** | | | | | | | | | |
| Fidelity Storage | $24,816.76 | 291,652.25 | 11,980.20 | | | | 11,980.20 | | |
| Merchants Storage | 25,040.96 | 67,487.82 | 40,437.57 | 30,717.57 | 9,720.00 | | | | |
| Rex Storage | 24,974.91 | 25,874.98 | 25,874.98 | | 25,874.98 | | | | |
| Eureka Storage | 25,010.37 | 30,954.29 | 18,526.00 | 15,756.00 | 2,770.00 | | | | |
| Inland Storage | 24,965.27 | 35,157.10 | 19,657.10 | | 19,657.10 | | | | |
| Atlas Storage | 24,269.01 | 63,432.48 | | | | | | | |
| **Year Ended 12/31/57:** | | | | | | | | | |
| Fidelity Storage | 24,878.85 | 283,596.46 | 8,806.36 | | | | 8,806.36 | | |
| Merchants Storage | 25,074.63 | 69,650.62 | 46,259.54 | 34,619.44 | 11,640.10 | | | | |
| Rex Storage | 25,087.78 | 26,461.65 | 26,461.65 | | 26,461.65 | | | | |
| Atlas Storage | 24,989.01 | 59,984.35 | | | | | | | |
| Eureka Storage | 25,497.03 | 31,202.02 | 22,327.50 | 15,756.00 | 6,571.50 | | | | |
| Inland Storage | 25,150.17 | 34,304.70 | 18,804.70 | | 18,804.70 | | | | |
| **Year Ended 12/31/58:** | | | | | | | | | |
| Fidelity Storage | 24,877.79 | 284,294.12 | 11,500.00 | | | | | | 11,500.00 |
| Merchants Storage | 15,633.45 | 74,259.21 | 50,333.21 | 28,295.71 | 13,415.50 | | | 8,622.00 | |
| Rex Storage | 3,286.86 | 3,612.00 | 3,612.00 | | 3,612.00 | | | | |
| Atlas Storage | 24,763.29 | 75,529.50 | | | | | | | |
| Eureka Storage | 23,647.57 | 30,436.40 | 30,432.40 | 15,756.00 | 9,096.40 | 5,580.00 | | | |
| Inland Storage | 24,954.67 | 36,494.32 | 15,000.00 | | 15,000.00 | | | | |

DEFENDANT'S EXHIBIT NO. 21
SCHEDULE OF INTERCOMPANY INCOME
CLARKSBURG, W. VA., GROUP

| Receiving Company | Net (Taxable) Income Per Return | Gross Receipts Per Return | Total Intercompany Income | PAYING COMPANY | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Clarksburg Terminal, Inc. | Atlas Storage Co. | Fidelity Storage Co. | Atlas Storage Handling | General Storage Handling |
| **Year Ended 12/31/56:** | | | | | | | | |
| Clarksburg Terminal, Inc. | $24,998.95 | 104,869.06 | 4,430.09 | | | 3,020.00 | 1,110.09 | 300.00 |
| Clarksburg Storage Co. | 24,980.50 | 33,883.00 | 29,383.00 | 29,383.00 | | | | |
| General Storage Co. | 24,964.04 | 28,092.33 (a) | 21,168.75 | 3,654.10 | 13,734.65 | | | |
| Owens Storage Co. | 25,005.05 | 42,926.00 | 42,926.00 | 42,926.00 | | | | |
| **Year Ended 12/31/57:** | | | | | | | | |
| Clarksburg Terminal, Inc. | 24,973.82 | 127,311.51 | | | | | | |
| Clarksburg Storage Co. | 24,839.16 | 35,446.50 | 30,946.50 | 30,946.50 | | | | |
| General Storage Co. | 23,695.23 | 36,558.16 (b) | 36,553.30 | 25,894.40 | 7,160.90 | | | |
| Owens Storage Co. | 25,061.03 | 43,295.60 | 43,295.60 | 43,295.60 | | | | |
| **Year Ended 12/31/58:** | | | | | | | | |
| Clarksburg Terminal, Inc. | 24,882.21 | 158,151.15 | | | | | | |
| Clarksburg Storage Co. | 24,582.19 | 34,096.00 | 29,596.00 | 29,596.00 | | | | |
| Owens Storage Co. | 24,542.96 | 41,087.00 | 41,087.00 | 41,087.00 | | | | |
| General Storage Co. | 1,931.05 | 4,752.00 (c) | 4,752.00 | | | | | |

**1956(a)**
This figure includes intercompany interest received from:

| | |
|---|---|
| Odnac Corporation | $ 280.00 |
| Inland Storage Co. | 1,600.00 |
| Atlas Storage Co. | 1,000.00 |
| Merchants Storage Co. | 700.00 |
| Eureka Storage Co. | 200.00 |
| Total | $3,780.00 |

**1957(b)**
Includes intercompany interest received from:

| | |
|---|---|
| Merchants Storage | $ 700.00 |
| Atlas Storage | 1,000.00 |
| Inland Storage | 1,600.00 |
| Eureka Storage | 200.00 |
| Total | $3,500.00 |

**1958(c)**
Includes intercompany interest received from:

| | |
|---|---|
| Cory Corporation | $ 540.00 |
| Chesapeake Terminal | 1,060.00 |
| Inland Storage | 1,600.00 |
| Atlas Storage | 1,000.00 |
| Merchants Storage | 552.00 |
| Total | $4,752.00 |

DEFENDANT'S EXHIBIT NO. 22
SCHEDULE OF INTERCOMPANY INCOME
COLUMBUS, OHIO, GROUP

| Receiving Company | Net (Taxable) Income Per Return | Gross Receipts Per Return | Total Intercompany Income | PAYING COMPANY Chesapeake Storage Co. | Chester Corp. |
|---|---|---|---|---|---|
| **Year Ended 12/31/56:** | | | | | |
| Chesapeake Storage | $15,919.85 | 70,961.85 | | | |
| Ohio Storage | 21,914.40 | 29,497.99 | 29,497.99 | 29,497.99 | |
| **Year Ended 12/31/57:** | | | | | |
| Chesapeake Storage | 24,043.44 | 104,436.60 | | | |
| Ohio Storage | 22,060.38 | 31,633.82 | 31,633.82 | 31,633.82 | |
| Cando Corporation | 18,322.83 | 28,933.82 | 4,639.53 | 4,639.53 | |
| Odnac Corporation | 21,092.80 | 28,726.95 | 2,321.41 | 2,321.41 | |
| Chesapeake Terminal | 12,673.03 | 17,969.72 | 8,969.72 | 3,969.72 | 5,000.00 |
| Chester Corporation | 12,683.95 | 17,969.72 | 3,969.72 | 3,969.72 | |
| **Year Ended 12/31/58:** | | | | | |
| Chesapeake Storage | 5,527.97 | 97,971.49 | | | |
| Ohio Storage | 15,249.08 | 25,381.20 | 25,381.20 | 25,381.20 | |
| Cando Corporation | 18,320.86 | 31,966.16 | 3,177.57 | 3,177.57 | |
| Odnac Corporation | 23,627.25 | 32,939.50 | 3,147.50 | 3,147.50 | |
| Chesapeake Terminal | 21,121.30 | 42,000.00 | | | |
| Chester Corporation | 22,505.20 | 42,000.00 | | | |
| Cory Corporation | 21,787.60 | 25,738.37 | 22,988.37 | 22,988.37 | |
| Ryco Corporation | 16,129.61 | 19,609.36 | 19,409.36 | 19,409.36 | |