ROCCO, INC. (FORMERLY ROCCO FEEDS, INC.), ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4328–75—4330–75.     Filed April 23, 1979.

---

[1]Cases of the following petitioners are consolidated herewith: Rocco Turkeys, Inc., docket No. 4329–75; Rocco, Inc., Rocco Turkeys, Inc., Rocco Turkey Farms, Inc., Rocco Farm Foods, Inc., Rocco Broiler Farms, Inc.; and Rocco Building Supplies, Inc., docket No. 4330–75.

*Carle E. Davis* and *Joseph C. Wool, Jr.,* for the petitioners.
*Stephen M. Friedberg,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases respondent determined deficiencies in petitioners' income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 4328–75 | Rocco, Inc | 1970 | $13,631.90 |
| 4329–75 | Rocco Turkeys, Inc | 1968 | 61,207.60 |
| | | 1969 | 162,833.18 |
| | | 1970 | 138,510.42 |
| 4330–75 | Rocco, Inc., et al | 1972 | 171,317.00 |

Concessions were made by both parties, leaving for our consideration only one issue. In 1971, petitioners Rocco, Inc., and Rocco Turkeys, Inc., both of which were on the accrual method of accounting, each formed a controlled corporate subsidiary to conduct certain phases of their integrated broiler chicken and turkey growing businesses. Both of the subsidiaries adopted the cash method of accounting, as authorized by section 1.471–6(a), Income Tax Regs., and both reported large operating losses for 1971, primarily because they did not reduce cost of goods sold by inventories, which losses the parent corporations utilized through the filing of a consolidated return for the entire controlled group. The issue is whether respondent, under the authority of section 269, I.R.C. 1954,[2] can require the reduction

---

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue, unless otherwise specified.

The application of sec. 482 was raised alternatively in the notice of deficiency in docket No. 4330–75, but the parties have stipulated that sec. 482 is not applicable.

of cost of goods sold by the value of the closing inventories of the two subsidiaries.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by reference.

Rocco, Inc. (hereinafter Rocco), is a corporation organized under the laws of the Commonwealth of Virginia on June 8, 1939, under the name of Rocco Feeds, Inc. Its name was changed to Rocco, Inc., on December 11, 1970. The principal office of Rocco is at 1 Kratzer Road, Harrisonburg, Va. Rocco was formed by R. B. Strickler and others. His son, R. H. Strickler (hereinafter Strickler) was Rocco's executive vice president and chief policy-making officer during 1969 through 1971. He became president of Rocco in 1972. Rocco is the common parent of an affiliated group of corporations consisting of Rocco, Rocco Turkeys, Inc., Rocco Turkey Farms, Inc., Rocco Farm Foods, Inc., Rocco Broiler Farms, Inc., and Rocco Building Supplies, Inc. Rocco and its affiliated corporations filed consolidated income tax returns for calendar years 1971 and 1972 with the Internal Revenue Service Center, Philadelphia, Pa. None of these corporations filed consolidated returns before 1971.

Until 1971, Rocco operated principally as a poultry feed mill and contract grower of poultry, principally broilers. The growers bought feed and other supplies from Rocco to raise the chicks which were at times supplied by Rocco. In keeping its books and records and preparing its income tax returns, Rocco used the accrual method of accounting on a calendar year basis. Its income tax returns for the taxable years 1968, 1969, and 1970 were filed with the Internal Revenue Service Center, Philadelphia, Pa.

Prior to 1967, Rocco operated feed mills and warehouses in various parts of Virginia and West Virginia as well as in Harrisonburg. Each of these was operated by corporate subsidiaries of Rocco. Separate corporations were formed because of differences in the State laws of Virginia and West Virginia and because it was important to Rocco that these operations have local identity. Also, R. B. Strickler believed in an entrepreneurial approach to business and would give the manager and assistant

manager of the corporations a percentage of the profits that were earned by the corporations which employed them.

Rocco experienced its first operating loss in 1961. At that time it became apparent to Rocco that the poultry business as a whole was shifting from separate and independent businesses dealing with the various aspects of the business (i.e., feed, hatcheries, growers, processers, marketers) to an integrated approach whereby one or more companies would combine all the phases into related organizations. Consequently, Rocco decided to liquidate all of the then-existing outlying feed mills over a 5-year period and build toward an integrated business. By the late 1960's, Rocco owned and operated breeder flocks, a hatchery, a feed mill, and had contract growers in the broiler chicken business. At that time Rocco's feed sales were approximately one-third retail, one-third broiler chicken, and one-third turkey. In 1967, Rocco formed a joint venture between itself, several hatcheries, and Blue Ridge Poultry & Egg Co., Inc. (hereinafter Blue Ridge), a processor,[3] in an effort to achieve the benefits of complete integration without actually having to integrate. The joint venture was terminated by Blue Ridge in late 1969 at which time Rocco also lost Blue Ridge as a customer for its broiler chickens. In July 1970, Rocco also lost the Rockingham Poultry Marketing Co-op, another processor, as a customer for its feed and broiler chickens. Since Blue Ridge and Rockingham had purchased approximately 12 million broiler chickens from Rocco, the loss of these customers meant that Rocco had also lost approximately one-third of its market for feed.

However, in December 1970, Blue Ridge, which had experienced business reverses, offered to sell its processing operation to Rocco. In order to make the acquisition, Rocco had to arrange lines of credit amounting to $5 million. Because Rocco had no expertise in processing and marketing of the processed product, Rocco approached Marval Poultry Co. (hereinafter Marval), which was a processor of turkeys, with the proposition that Marval become a stockholder in the corporation Rocco was planning to form to operate the processing business. Marval wanted a 50-percent interest in the corporation but after negotiations with Rocco settled for a 20-percent interest.

---

[3] A "processor" buys fully grown birds, prepares them for market, and sells them. A "processor" may also buy baby chicks and raise them.

As a result of the negotiations, on January 21, 1971, Rocco Farm Foods, Inc. (hereinafter Farm Foods), was incorporated by Rocco and Marval. Its principal place of business is at Edinburg, Va. It keeps its books and records and prepares its income tax returns on the accrual method of accounting and on the basis of a calendar year.

Farm Foods acquired the processing plant from Blue Ridge in February 1971. Its principal business since then has been the processing and marketing of broiler chickens. The management of Blue Ridge was employed in order to provide further expertise in the processing and marketing operation.

In order to supply Farm Foods with broiler chickens for processing and marketing, Rocco Broiler Farms, Inc. (hereinafter Broiler Farms), was formed on February 5, 1971, as a wholly owned subsidiary of Farm Foods. The principal office of Broiler Farms is at 1 Kratzer Road, Harrisonburg, Va. From the time of its incorporation, Broiler Farms adopted and continues to keep its books and records and prepares its income tax returns on the cash method of accounting and on the basis of a calendar year. Broiler Farms is a contract grower of broilers and Farm Foods is its only customer. Upon its incorporation Broiler Farms purchased Rocco's broiler contracts for their book value.

For several reasons, the decision was made to operate the contract broiler phase and the processing phase in corporations separate from each other and separate from Rocco. Strickler believed combining the two operations into a single corporation would have been poor business practice because of their different functions. The progress in the poultry business was toward integration with separate entities performing the various functions. To be able to compete successfully, Strickler and Marval felt that this structure was the best way to proceed. Moreover, Marval, as a shareholder of Farm Foods, would not have permitted the broiler operation to remain completely under Rocco's control as a division of Rocco.

Rocco Turkeys, Inc. (hereinafter Turkeys), is a corporation organized under the laws of the Commonwealth of Virginia on January 15, 1957, under the name of Rocco Turkey Hatchery, Inc. Its name was changed to Rocco Turkeys, Inc., on June 24, 1966. The principal office of Turkeys is in Harrisonburg, Va. Turkeys is a wholly owned subsidiary of Rocco. Turkeys kept its books and records and prepared its income tax returns using the

accrual method of accounting and on the basis of a calendar year. Its income tax returns for the taxable years 1968, 1969, and 1970 were filed with the Internal Revenue Service Center, Philadelphia, Pa.

The principal activity of Turkeys is the range production of turkeys. Under a range contract growing operation, the poults are brooded in a 12-by-12-foot brooder house until they are 6 to 8 weeks of age. They are then allowed to roam free in a fenced area supplied with feed. Because of inclement winter weather in Virginia, the range growing took place during the warm months with a view to supplying the Thanksgiving and Christmas demand for whole turkeys. Turkeys acquired its feed from Rocco, and Turkeys constituted approximately one-third of Rocco's market. During 1969 and 1970, Turkeys had two customers for its range turkeys—Marval bought two-thirds of its product and Swift bought the other third.

In early 1963, Strickler became interested in confinement growing of turkeys. Confinement growing is a means of producing heavy breed turkeys on a year-round as opposed to a seasonal basis. These turkeys are usually sold in pieces rather than as whole turkeys. The facilities for confinement growing include a windowless house 70 feet wide and 300 feet long with 6 inches of overhead fiberglass insulation. The building's light is controlled by dimmers and the heat, food, and water are controlled mechanically. Confinement growing differs from range growing of turkeys in its capital requirements, which are substantial. Confinement growing also entails different risk factors from that of range growing. Strickler and his brother converted as an experiment one of their personal chicken farms into a confinement turkey operation in order to develop the systems necessary for confinement growing. In 1967, Rocco and Marval as equal shareholders incorporated Gobblers, Inc. The corporation built a confinement growing facility which constituted another stage in the development toward confinement growing of turkeys.

Confinement growing naturally requires a year-round market for the turkeys. In order to develop that market, a processor set up for further processing of turkeys is necessary. Further processing in the turkey business means breaking up a heavy breed turkey into different parts or forms and marketing them fresh, frozen, or cooked.

Marval, which used two-thirds of Turkeys' range production, was not set up in 1970 for further processing of heavy breed turkeys.[4] However, Marval decided in 1970 to convert its processing and marketing operations to a year-round basis. Because of this decision Marval strongly encouraged Strickler to enter the confinement growing business and intimated that Turkeys would lose Marval as a customer for its range turkeys and that Marval would become a competitor in the confinement growing business if the decision were not made.

Consequently, on August 9, 1971, Rocco Turkey Farms, Inc. (hereinafter Turkey Farms), was incorporated as a wholly owned subsidiary of Turkeys in order to carry on the business of confinement growing of turkeys. The principal office of Turkey Farms is at 1 Kratzer Road, Harrisonburg, Va. Turkey Farms adopted the cash method of accounting for its first taxable year ending December 31, 1971. Turkey Farms obtained its initial inventories of heavy breed turkeys from Gobblers, Inc., and Dogwood.

However, Turkey Farms did not begin immediately upon incorporation to produce confinement grown, heavy breed turkeys for further processing. Instead, it convinced growers with chicken brooder houses who had been cut off from a processor when Rocco lost Rockingham as a customer for its broiler chickens to grow fryer-roaster turkeys in the brooder houses. This was viewed as a way of retaining these suppliers while giving them a chance to reequip their facilities for confinement growing of heavy breed turkeys and to give Turkey Farms time to set up facilities for confinement growing of heavy birds. Although fryer-roasters were grown inside the chicken brooder houses, they were not considered in the industry as confinement grown. This was due in part to the fact that fryer-roasters are not suitable (too small) for further processing and in part to the fact that the facilities necessary for the two types of turkeys differ in construction and capital outlay.

The objective of Strickler was to continue Turkeys in the range growing business while Turkey Farms would conduct all the confinement growing business. The same standard contract used by Turkeys concerning range growing of turkeys was used

---

[4] Swift, Turkeys' other customer at this time, was not set up for further processing either, but evidently it did not intend to convert from seasonal marketing of whole turkeys.

by Turkey Farms concerning growing of fryer-roaster turkeys in 1971.

In 1971, Turkey Farms had sales of $953,044.95 and purchases of $1,884,974.41. In 1971, the salaries of Turkey Farms' operating employees were paid by Turkeys or Rocco.[5] Turkey Farms had no expenses in 1971 other than office supplies and interest. For feed sold to its subsidiaries, Rocco added a charge that covered overhead and administrative expenses.

In adopting the cash method of accounting for Broiler Farms and Turkey Farms, Strickler was aware of the differences between cash and accrual accounting and that ending inventories are not reported under the cash method. He also relied upon a 1968 study by the Southeastern Poultry and Egg Association which showed that approximately 80 percent of the industry in the southeastern United States used the cash method of accounting.

The consolidated net operating loss claimed on the consolidated return for Rocco and its subsidiaries for 1971 amounted to $2,348,171.60. The undisputed adjustments made by respondent reduced the consolidated net operating loss to $2,261,235.07. Reflected in this consolidated net operating loss were the following taxable incomes (incorporating undisputed adjustments made by respondent):

Turkey Farms ............................($941,891.67)
Farm Foods ................................ (861,020.28)
Broiler Farms ............................. (926,687.55)

On the consolidated return filed for 1971, Broiler Farms did not report ending inventory for its broiler chicken contracts in process. Turkey Farms also did not report ending inventory for its turkey contracts in process for 1971.

Of the $2,261,235.07 consolidated net operating loss, $780,261.77 was attributable to Turkeys and will be a net operating loss carryback to Turkey's separate returns for the calendar years 1968, 1969, and 1970, provided section 269 is not applicable to the acquisition of the capital stock of Turkey Farms.[6] Turkeys' taxable income for each of the calendar years

[5]According to Strickler, the reason for this was an accounting error which was corrected during the following taxable year.

[6]This finding is as stipulated in par. 15 of the stipulation of facts which the parties refer to on brief as being made to facilitate consideration of the case by stipulating the effect of the decision of the

1968, 1969, and 1970, prior to the application of this loss carryback was as follows:

| Year | Amount |
|------|--------|
| 1968 | $126,340.20 |
| 1969 | 318,812.83 |
| 1970 | 291,941.92 |

The share of the consolidated net operating loss carryback attributable to Farm Foods ($713,283.99) and attributable to Broiler Farms ($767,689.31) will be allocated to Rocco's separate return years 1968, 1969, and 1970, provided that section 269 is not applicable to the acquisition of the capital stock of Broiler Farms and Farm Foods. Rocco's taxable income, as adjusted by respondent and before net operating loss deductions for each of the years was as follows:

| Year | Amount |
|------|--------|
| 1968 | $253,052.32 |
| 1969 | 224,759.71 |
| 1970 | 91,951.14 |

### ULTIMATE FINDING OF FACT

The principal purpose of Rocco's acquisition of control of Broiler Farms and Turkeys' acquisition of control of Turkey Farms was not evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or allowance which Rocco or Turkeys would not otherwise enjoy.

### OPINION

In the notice of deficiency in docket No. 4330–76, respondent determined that the capital stock of Broiler Farms and Turkey Farms was acquired for the principal purpose of obtaining deductions for the inventories of broiler chickens and fryer-roaster turkeys in process at the end of the taxable year 1971, and pursuant to section 269 of the Internal Revenue Code increased the consolidated taxable income of the consolidated group for 1971 by deducting or eliminating from the cost of

---

Court in this case. We note that in the petition in docket No. 4329–75 it is alleged that $739,570.02 of the consolidated loss was attributable to *Turkey Farms* which was properly a net operating loss carryback of Turkeys to the years 1968, 1969, and 1970 for which it filed separate returns.

goods sold the value of the closing inventories of Broiler Farms and Turkey Farms for that year. While the notices of deficiency are neither models of clarity nor fonts of information, the effect of what respondent determined was to place Broiler Farms and Turkey Farms on the accrual method of accounting, for ending inventories at least.

Respondent does not challenge directly or indirectly petitioners' privilege to file consolidated returns for 1971 and 1972.[7] In fact, respondent points out that section 1.1502–17, Income Tax Regs., provides that in filing a consolidated return, the method of accounting to be used by each member of the group shall be determined in accordance with the provisions of Code section 446 as if such member filed a separate return. Nor does respondent invoke directly the various provisions of section 446 which limit a taxpayer's right to adopt or change to various methods of accounting.[8] Respondent recognizes for purposes of this case that both Broiler Farms and Turkey Farms are farming corporations and that pursuant to the provisions of section 1.471–6, Income Tax Regs., farmers may initially elect to make their returns on either the inventory method or the cash receipts and disbursement method of accounting. Furthermore, respondent does not contend that Broiler Farms and Turkey Farms are sham corporations and, as previously mentioned, he has stipulated that section 482 is not applicable to this case.

Respondent does contend, however, that Rocco and Turkeys had previously engaged in the broiler and turkey businesses themselves and, being on the accrual basis of accounting, the closing inventories of broilers and turkeys would have been taken into account in computing their taxable incomes for 1971 and 1972; and that Broiler Farms and Turkey Farms were formed as new and separate corporations to engage in the same

---

[7] The fact that petitioners filed consolidated returns is actually responsible for the result of which respondent complains. If Broiler Farms and Turkey Farms had not been members of the consolidated group, their operating losses in their first years of operation would not have been available to the other members of the group.

[8] Sec. 446(a) and (e) provide in part:

(a) * * * Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

*　　　*　　　*　　　*　　　*　　　*　　　*

(e) * * * Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate.

businesses for the principal purpose of evading or avoiding tax by securing the benefit of a "deduction, credit or allowance" which they would not otherwise enjoy, i.e., the privilege of switching these businesses to the cash instead of the accrual method of accounting without first obtaining the Commissioner's approval. This, respondent contends, permits him to invoke section 269[9] to require the reduction of Broiler Farms' and Turkey Farms' costs of goods sold by the value of their ending inventories at December 31, 1971.

Petitioners argue that respondent's determination is erroneous for several reasons. They argue that the adoption of the cash method of accounting is an election permitted by section 446(d)[10] and section 1.471-6(a), Income Tax Regs., see *infra*, and therefore is not subject to the provisions of section 269. They also contend that adoption of the cash method by the subsidiaries is not a "deduction, credit, or other allowance" as that phrase has been defined for purposes of section 269. Nor did incorporation of the subsidiaries result in the attainment of a tax benefit which would not have been otherwise enjoyed. And finally petitioners urge that business reasons predominated in the decisions to incorporate Broiler Farms and Turkey Farms; hence, the intent necessary to trigger application of section 269 is absent.

Initially, we doubt that section 269 was designed or intended to accomplish what respondent seeks to use it for in this case; at least we have not found any cases in which it has been used this way before. Certain legal criteria not in dispute provide the reasons for our doubt.

Broiler Farms and Turkey Farms, conceded to be farming

---

[9]Sec. 269(a) provides in pertinent part:

(a) In General.—If—

    (1) any person or persons acquire * * * directly or indirectly, control of a corporation, * * *

    *      *      *      *      *      *      *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person * * * would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For the purposes of paragraphs (1) * * * , control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

[10]Sec. 446(d) provides:

A taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.

corporations, had the option of adopting the cash method of accounting even though both corporations had inventories. Sec. 1.471–6(a), Income Tax Regs; compare sec. 1.446–1(c)(2)(i), Income Tax Regs.;[11] *Van Raden v. Commissioner*, 71 T.C. 1083 (1979); cf. *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438 (1975); *Hi-Plains Enterprises, Inc. v. Commissioner*, 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974). Under the cash method of accounting beginning and ending inventories are not taken into consideration in computing net income. See sec. 1.61–4(a), Income Tax Regs.; compare sec. 1.61–4(b), Income Tax Regs. Therefore, in the first year of operation, the cost of production is higher under the cash method than it would be under the accrual method if there are unfinished or unsold products in inventory at the end of the year and, consequently, taxable income will be less under the cash method than under the accrual method.[12] When a consolidated return was filed by petitioners for the taxable year 1971 each corporation in the group reported its income and expenses under the method of accounting it employed, as it was entitled to do. Sec. 1.1502–17(a), Income Tax Regs. However, in large part because of their method of accounting, Broiler Farms and Turkey Farms incurred net operating losses. These net operating losses became part of the consolidated net operating loss for 1971 and were used to offset consolidated net income. And because Broiler Farms and Turkey Farms were not in existence prior to 1971, the unused portion of the consolidated net operating loss was carried back and applied to offset the taxable incomes of Rocco and Turkeys in prior years.[13]

Apparently finding no fault with the foregoing tax account-

---

[11]This case does not involve the effect of sec. 447 which requires certain corporations engaged in farming to compute taxable income on an accrual method of accounting. Sec. 447 was enacted as part of the Tax Reform Act of 1976 and generally applies to taxable years beginning after Dec. 31, 1976. The fact that Congress found it necessary to enact sec. 447 to limit the benefits sometimes derived from the cash method of accounting to small or family owned farming corporations casts some doubt on whether respondent previously had available a tool to prevent other farming corporations from taking advantage of those benefits. See General Explanation of the Tax Reform Act of 1976 prepared by the staff of the Joint Committee on Taxation, Dec. 29, 1976, p. 52.

[12]This tends to reverse itself in the second year, and even out thereafter, because under the cash method the cost of goods produced in the first year which are sold in the second year will not be included in cost of goods sold in the second year. See *Van Raden v. Commissioner*, 71 T.C. 1083 (1979).

[13]We have not attempted to explain in detail the mechanics of net operating loss deductions under the statutes, rules, and regulations governing consolidated returns. Suffice it to say that the above synopsis adequately sets forth for our purposes the manner in which the consolidated returns were prepared and respondent has no dispute with it.

ing principles utilized by petitioners, respondent turns to section 269 to correct a result which he determined did not clearly reflect the income of the consolidated group.[14]

On its face, the scope of section 269(a) may be broad enough to preclude adoption of an accounting method by newly created subsidiaries if the requisite tax avoidance purpose is present. As stated in section 1.269–1(a), Income Tax Regs., "The term 'allowance' refers to anything in the internal revenue laws which has the effect of diminishing tax liability." But the reach of section 269 is not limitless. For example, incorporation in order to elect subchapter S status (*Modern Home Fire & Casualty Insurance Co. v. Commissioner*, 54 T.C. 839, 853 (1970); Rev. Rul. 76–363, 1976–2 C.B. 90), or to obtain the tax benefits provided for Western Hemisphere trade corporations, Rev. Rul. 70–238, 1970–1 C.B. 61, superseding I.T. 3757, 1945 C.B. 200, have survived attack under section 269(a). And it has been suggested that incorporation to obtain the special tax treatment provided for life insurance companies will be permitted in spite of section 269(a). See *Alinco Life Insurance Co. v. United States*, 178 Ct. Cl. 813, 373 F.2d 336, 341 (1967). Furthermore, section 269 does not apply to disallow nonrecognition of income otherwise permitted by statute. *Bijou Park Properties, Inc. v. Commissioner*, 47 T.C. 207, 214 (1966); *Siegel v. Commissioner*, 45 T.C. 566 (1966); *Supreme Investment Corp. v. United States*, 468 F.2d 370 (5th Cir. 1972).

These limitations to the scope of section 269(a) involve corporations organized to take advantage of provisions that represent a deliberate granting of tax benefits. Similarly, the immediate tax benefits that may be realized by farming operations through their privilege to elect a cash method of accounting are benefits that were quite consciously granted, and may be considered analogous to those elections cited above which are beyond the reach of section 269. In *United States v. Catto*, 384 U.S. 102, 116 (1966), the Supreme Court said:

> The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a

---

[14]The language "does not clearly reflect income" is, of course, used in sec. 446, on which respondent does not directly rely, and does not appear in sec. 269. Respondent's approach in this case appears to be yet another effort "to persuade the Courts to extricate him from the box in which he finds himself as to his ability to modify the option he has given farmers to choose between the cash or accrual basis of accounting." Concurring opinion in *Van Raden v. Commissioner, supra.*

unitary and expedient bookkeeping system for farmers and ranchers in need of simplified accounting procedure. * * *

Our review of case law indicates that section 269 is usually invoked to disallow tax benefits which were known to exist at the time of the acquisition, such as net operating losses previously incurred by another corporation, e.g., *Glen Raven Mills, Inc. v. Commissioner*, 59 T.C. 1 (1972), or multiple surtax exemptions, e.g., *Atlas Storage Co. v. United States*, 306 F. Supp. 570 (S.D. W.Va. 1969), or other specific deductions or credits, allowance of which would result in a permanent reduction of revenue. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 16.21, p. 61–31 (3d ed. 1971). Here respondent is attempting to disallow a benefit which defers the tax but does not result ultimately in the avoidance or evasion of tax.

The basis of respondent's adjustments with regard to the inventories is that the end result of the incorporation of the subsidiaries and their adoption of the cash method of accounting is a change in the method of accounting used by Rocco and Turkeys without obtaining the Commissioner's consent.[15] For support of this rather oblique approach, respondent relies heavily on *Peterson Produce Co. v. United States*, 205 F. Supp. 229 (W.D. Ark. 1962), affd. 313 F.2d 609 (8th Cir. 1962). While *Peterson* involved a change in method of accounting within the feed and hatchery business, it is not particularly relevant to this discussion. There, the taxpayer established a separate broiler farming division which adopted the cash method of accounting. The court held, *under section 446*, that the new division did not qualify as a separate and distinct business which permitted it to elect the cash method of reporting under section 1.446–1(d), Income Tax Regs. Here Broiler Farms and Turkey Farms were organized and operated as separate corporations and they were entitled to elect the cash method of accounting, regardless of whether their businesses were separate and distinct from

---

[15]It is not clear how respondent expects Broiler Farms and Turkey Farms to compute their incomes in future years. In resorting to sec. 269, respondent disallows deductions for the years involved, he does not change them to the inventory method of accounting. But unless the corporations are permitted to use opening inventories in the succeeding year there will be a real distortion of income. See *Clement v. United States*, 217 Ct. Cl. ___, 580 F.2d 422, 432 (1978), cert. denied 440 U.S. 907 (1979), as to whether respondent has the right to place a farmer on the inventory method.

Rocco's and Turkeys'. Furthermore, *Peterson* was concerned with section 446, not section 269.

It was not the acquisition of control of Broiler Farms by Rocco and of Turkey Farms by Turkeys that resulted in the tax benefit herein decried by respondent—it was a combination of the accounting method Broiler Farms and Turkey Farms were authorized to use and the filing of consolidated returns which the consolidated group was also authorized to use which produced the tax benefits in those particular years. See *Cromwell Corp. v. Commissioner*, 43 T.C. 313 (1964); *Siegel v. Commissioner, supra.* Even under section 446 respondent could hardly claim that the cash method would not clearly reflect the incomes of Broiler Farms and Turkey Farms if used consistently over the years.

Thus, while we recognize that respondent is given broad authority by this statute, we question whether he has overstepped the bounds in applying section 269 in this case.

However, we need not decide the legal issue posed above because, assuming that section 269 is applicable here, we have found as a fact that the principal purpose for Rocco and Turkeys "acquiring control" of Broiler Farms and Turkey Farms was not to avoid or evade tax by securing the benefit of a deduction, credit, or other allowance they would not otherwise enjoy.[16]

In order for section 269 to be applied in this case, the tax avoidance motive must be the principal purpose for the acquisition of control (i.e., the organization of Broiler Farms and Turkey Farms as wholly owned but separate subsidiary corporations). Sec. 269(a); sec. 1.269–3(a), Income Tax Regs.; *Capri, Inc. v. Commissioner*, 65 T.C. 162 (1975). The regulation provides that if the purpose to evade or avoid tax exceeds in importance any other purpose, it is the principal purpose. To prevail, petitioners need prove only that avoidance of tax was not the principal purpose. *Capri, Inc. v. Commissioner, supra; Bush Hog Manufacturing Co. v. Commissioner*, 42 T.C. 713, 729 (1964). But, to meet their burden of proof, petitioners must prove respondent's determination is wrong by a preponderance of the evidence. *Capri, Inc. v. Commissioner, supra.*

---

[16]It is not clear from the notice of deficiency or respondent's brief just who secured the tax benefit by acquiring control. Presumably respondent claims that Rocco and Turkeys did. But they acquired the tax benefit by virtue of filing consolidated returns with Broiler Farms and Turkey Farms, not directly by acquiring control of the new corporations.

The evidence shows that historically Rocco, Inc., the parent corporation of the consolidated group, conducted its various activities through separate corporations, for reasons unrelated to taxes. In the 1960's, the feed and hatchery business was in a period of change so that it became important or necessary for a corporation in the feed, hatchery, or growing business to integrate all of the functions from breeding to marketing in one organization. Rocco proceeded to do this but largely operated each integrated function by separate corporations in accordance with its past practice.

Rocco had never been in the processing and marketing business but was forced into it by its competitors in late 1970. With respect to its broiler chicken business, Rocco enlisted the aid and assistance of one of its customers in the turkey processing business, Marval. Rocco and Marval formed Farm Foods to process and market the broilers grown by Rocco and to provide Rocco with a market for its feed and chicks. Marval acquired a 20-percent interest in Farm Foods and Rocco acquired the remainder. Farm Foods acquired the processing facilities of Blue Ridge, which required a considerable outlay of capital and the opening up of an extensive line of credit. In order for Marval to participate in the processing venture, Marval insisted on having a measure of control over the source of supply of broilers to the processing plant. Broiler Farms was therefore organized to take over the broiler business that had been conducted by Rocco. Broiler Farms' broilers were sold to Farm Foods. Broiler Farms was a wholly owned subsidiary of Farm Foods so Marval acquired a measure of control over the source of supply to the processing plant through its 20-percent interest in Farm Foods.

The testimony by Strickland of Rocco and Nelson of Marval as to why Broiler Farms was established as a separate corporation is reasonable, logical, and consistent. There is no evidence to contradict it except the fact that Broiler Farms suffered a sizable loss in its first year of operation which Rocco was able to take advantage of through filing a consolidated return. But at the time Farm Foods and Broiler Farms were organized (in early February of 1971), such a loss was not anticipated. Rocco had operated the broiler business at a profit over the years and Blue Ridge had operated the processing business at a profit. Nevertheless, since the processing business was a venture in which

Rocco had little experience, it was reasonable for Rocco to limit its liability by keeping the venture separated from the feed business. In any event, we will not attempt to determine the form in which a taxpayer must conduct his business. Cf. *Higgins v. Smith*, 308 U.S. 473, 477 (1940). It is sufficient that Rocco believed there was a sound business reason for adopting this form of doing business and that this was the reason Broiler Farms was organized rather than primarily to obtain a tax benefit.

It is undoubtedly true that when it was decided to file a consolidated return for the group, the losses of Broiler Farms and Turkey Farms were known and the decision to file a consolidated return was probably influenced by the immediate tax advantage of doing so. However, the issue here is the principal purpose for *acquiring* the corporation, which must be decided as of the time of its formation. *Hawaiian Trust Co. Ltd. v. United States*, 291 F.2d 761 (9th Cir. 1961); *Capri, Inc. v. Commissioner, supra.* Furthermore, "the fact that favorable tax consequences were taken into account on entering into the transaction is no reason for disallowing these consequences." *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978).

The evidence also supports our conclusion that tax avoidance was not the principal purpose for the formation of Turkey Farms to engage in the business of confinement growing of turkeys. It is true that Turkeys was already in the business of range growing turkeys and might have either converted or expanded to confinement growing. However, again we are not versed in the poultry business, and petitioners' evidence indicates that petitioners thought there was a sound business purpose for conducting the confinement growing of turkeys through a separate corporation, which seems reasonable to us.

The evidence is that Rocco or Turkeys was more or less forced into the confinement growing turkey business by Marval, which wanted the heavier birds to process and market on a year-round basis. Petitioners wanted to continue in the range turkey business but thought it was best, if not necessary, to move into the confinement turkey business to meet Marval's demands and retain it as a customer. Confinement growing involved new and different procedures than range growing, year-round activity as opposed to summer and fall activity, a different breed of birds, different risk factors, and radically different facilities, which

are costly. Petitioners' witnesses characterize it, and reasonably we think, as a different business from range growing turkeys. It was consistent with petitioners' business history, the custom in the industry, and sound business practices to conduct this new business through a separate corporation. It is no answer to say, as respondent does, that the confinement growing business could have been conducted as a "division" of Turkeys. It is not a question of what could have been done; the question is whether what was done was done for business reasons rather than primarily for tax avoidance. Respondent offered little evidence to support a finding of tax avoidance as the principal purpose for forming Turkey Farms. As petitioners point out, even had the confinement growing business been set up as a division of Turkeys, Turkeys would probably have been entitled to account for that business on a cash basis. Section 1.446–1(d)(1), Income Tax Regs., recognizes that a taxpayer may have more than one distinct trade or business and that different accounting methods may be adopted with respect to each separate and distinct trade or business. But see *Peterson Produce Co. v. United States*, discussed *supra*.

Respondent points to evidence that Turkey Farms paid no employees in 1971, had the same office address as Rocco, and used the same contract forms as used by Turkeys as indications that Turkey Farms was formed for the principal purpose of tax avoidance. While the record does not clearly support the facts alleged by respondent, such facts might imply that Turkey Farms was a sham—but respondent does not so contend. There is no convincing evidence in the record that at the time Turkey Farms was formed the principal purpose for its formation as a wholly owned subsidiary of Turkeys was to gain a tax advantage by having it adopt a cash method of accounting. While Strickland testified that he was aware that ending inventories were not taken into consideration under the cash method of accounting, he also testified that he did not consult an attorney or tax adviser about the advisability of engaging in the confinement turkey growing business or the broiler growing business through separate corporations.

We find that petitioners have carried their burden of proving that respondent erred in his determination that petitioners acquired control of Broiler Farms and Turkey Farms for the principal purpose of tax evasion or avoidance by securing the

benefit of a deduction, credit, or allowance they would not otherwise have enjoyed. Our ultimate finding of fact disposes of this issue in favor of petitioners.

Because of concessions on other adjustments,

*Decisions will be entered under Rule 155.*