DONNA P. WOOLLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Woolley v. Commissioner
Docket Nos. 23923-88, 23924-88
United States Tax Court
T.C. Memo 1991-131; 1991 Tax Ct. Memo LEXIS 150; 61 T.C.M. (CCH) 2225; T.C.M. (RIA) 91131; March 25, 1991, Filed *150 Decision will be entered under Rule 155. Charles P. Duffy, Philip N. Jones, Steven A. Nicholes, and David A. Kekel, for the petitioner. Karen E. Stratton, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION By means of two notices of deficiency, respondent determined deficiencies in Federal income tax and additions to tax for petitioner's 1981 through 1984 taxable years, as follows: Additions to Tax
Year
Deficiency
[1] Sec. 6653(a)(1) Sec. 6661
1981
$ 310,999
$ 15,550
-0- 1982
34,667
1,592  $ 7,959 1983
29,487
1,474  7,372
1984
158,078
7,904  39,520
After all four years were *151 petitioned, respondent filed a motion to dismiss the 1981 taxable year for lack of jurisdiction because that year had been the subject of another notice of deficiency for which a decision had been entered. Respondent's motion was granted and the 1981 taxable year is no longer before the Court. Petitioner, in addition to alleging that respondent has erred with respect to the 1982 taxable year, asserts that there is a $ 368,102 overassessment for the 1982 taxable year. The issues for our consideration are: (1) Whether petitioner acquired shares of stock in Eagle's Quest, Inc. (an "S" corporation), with the principal purpose of evading or avoiding tax within the meaning of section 269; (2) whether petitioner's basis in a subchapter S corporation should be increased for advances made to a partnership in which the subchapter S corporation was and petitioner was not a partner; (3) whether petitioner is liable for additions to tax under section 6653(a)(1) and (2) and section 6661. FINDINGS OF FACT General
The parties' stipulation of facts, along with exhibits, are in evidence and are incorporated into this opinion by this reference. Petitioner Donna P. Woolley had her legal residence *152 in Drain, Oregon, at the time the petition was filed in this case. She has regularly resided in Drain, which has a population of approximately 1,200. Petitioner, a high school graduate, met Harold Woolley during 1944 at a time when she worked as a bookkeeper in the Drain, Oregon, office of Harold's logging company. Petitioner and Harold were married and had three children, Donald, Daniel, and Debra. Petitioner's children were adults during the years under consideration. Harold died during September 1970. At that time, the Woolley family owned about 48,000 acres of timberland. Petitioner has been the principal shareholder in the family corporate entity and managed the family assets since the time of Harold's death. Eagle's View Management Company, Inc.
Eagle's View Management Company, Inc. (EVM), was incorporated under the laws of Oregon on June 30, 1980. The Woolley family transferred their substantial timberland holdings, shares in Woolley Enterprises, Inc., and shares in Ashland Hills Inn, Inc., to EVM. Woolley Enterprises, Inc., was engaged in managing and harvesting the Woolley family timberlands and Ashland Hills owned and operated a large motel complex in Ashland, *153 Oregon. At all relevant times, petitioner was the chief executive officer of EVM. During the years in issue, petitioner owned 2,243 shares and a trust for her benefit owned the remaining 7,757 of 10,000 outstanding and issued 10-percent noncumulative voting preferred stock of EVM. During the years in issue, the 2,866 issued and outstanding shares of class A voting common stock of EVM were owned as follows: Shareholder
Number of Shares
Donna P. Woolley
157
Trust f/b/o Donna P. Woolley
543
Trust f/b/o Debra A. Woolley
722
Trust f/b/o Donald W. Woolley
722
Trust f/b/o Daniel G. Woolley
722
TOTAL          2,866 During the same period, the 15,445 issued and outstanding shares of class B nonvoting common stock of EVM were owned as follows: Shareholder
Number of Shares
Donna P. Woolley
14,784
Trust f/b/o Donna P. Woolley
28   Debra A. Woolley
211  Donald W. Woolley
211  Daniel G. Woolley
211  TOTAL          15,445
Petitioner was the trustee for each of her children's trusts and she was co-trustee with Christian Brenden of the trust for her own benefit. Petitioner's Business Experiences
Petitioner and her family possessed a relatively large *154 timber enterprise which has provided her with the potential to invest in timber-related and extraneous business enterprises. Petitioner's approach to the corporate and family business ventures was generally macroscopic and she was not intimately involved in the day-to-day nuances of specific businesses. She had a basic working knowledge of the status (including financial) of the entities and ventures. She had no tax expertise and did not regularly rely upon her financial and legal advisors. Petitioner, although limited in education and business acumen, tended to become involved in financial ventures based upon her own judgment, with only limited involvement of her advisors. On those occasions her advisors would be placed in the situation of reacting to the circumstances without the benefit of advance tax and business planning. Petitioner's business practice has been to ride out losing transactions even where her professional advisors and family members urged abandonment of the enterprise. In addition to the transaction which is the subject of the claimed loss in this case, petitioner was involved in two other transactions which resulted in losses during the period under consideration. *155 One transaction involved the Ashland Hills, Inc., motel complex. Petitioner lost between $ 10 and $ 15 million before deciding to abandon that project. In another transaction involving Pacific Rim Hardwoods (a veneer company), petitioner lost more than $ 1,679,000 before deciding to abandon that enterprise. Eagle's Quest and Queststar
Eagle's Quest, Inc. (EQI), and Queststar are the central focus of the issues in this case. During 1983 petitioner became interested in acquiring the rights to manufacture a specialized form of weight-lifting or exercise equipment. The unique aspect of this equipment was the user's ability to vary the amount of weight on a particular machine, while continuing to exercise, by pushing a button. The machine, in some way, used water to vary the weight or tension upon the user. The inventor denominated this device as "Queststar." Petitioner believed that Queststar had investment potential and would be a profitable venture. EQI was incorporated in Oregon on June 28, 1983, and was formed for the purpose of manufacturing Queststar weight-lifting equipment. One hundred shares of common stock of EQI were issued as follows: 87 -- EVM, 10 -- James *156 G. White, 3 -- George A. Morris. No other EQI shares were ever issued or outstanding. Eaglet, Inc. (Eaglet), was organized in California by Ken Sprague and Sid Tinberg. On June 30, 1983, EQI and Eaglet formed a 50-50 joint venture named "Queststar" under the laws of Oregon to market the equipment and to operate a health club using the Queststar equipment. The health club was also intended to be a showroom where the equipment could be shown to prospective customers. On or about June 30, 1983, Queststar took over the operation of a health club in Santa Monica, California, which had been operated by Ken Sprague and Sid Tinberg, the principals of Eaglet. On September 1, 1983, Queststar leased realty in Los Angeles, California, and began improving the property with a view to opening and operating another health club with Queststar equipment. Petitioner, on the same date, acquired an option to purchase that property. On December 1, 1983, petitioner exercised her option to purchase (for $ 7 million) the Los Angeles realty, thereby becoming Queststar's landlord. When this venture later fell apart, petitioner, during 1986, sold the realty for a $ 1,371,034 gain after it had been vacant *157 (without producing rent) for about 2 years. Petitioner was a member of Queststar's management committee, participated in significant matters, and had regular contact with the Los Angeles Queststar operation. During August 1983 EQI made arrangements with a bank to borrow $ 650,000 and EVM and petitioner personally guaranteed repayment of up to $ 1.5 million in loans to EQI. EQI actually borrowed $ 200,000, which was repaid by the entities using funds contributed by petitioner. During 1985 and 1986 petitioner advanced $ 98,200.34 and $ 2,500, respectively, to EQI. At its fiscal year ended May 31, 1984, EQI had a $ 543,968 negative net worth. During 1984 petitioner made loans totaling $ 868,000, with the largest amount ($ 585,000) being lent on December 10, 1984. For its 1985 and 1986 taxable years, EQI had expenses in excess of income in the amounts of $ 253,375 and $ 15,659, respectively. Queststar borrowed $ 625,000 on August 20, 1983, and EVM, petitioner, and Sprague personally guaranteed payment. Queststar's expenses exceeded its income by $ 96,703 and $ 1,613,517 for its taxable years ended October 31, 1983 and 1984, respectively. It also had $ 96,700 and $ 694,732, respectively, *158 of negative net worth at the end of those taxable years. During 1984 petitioner advanced $ 712,000 to Queststar to meet its working capital needs. Petitioner also made direct payments to a Queststar creditor in the amount of $ 78,000 during 1984. Petitioner realized that Queststar had no security to offer her in connection with advances made and that she would be repaid only if Queststar had profits. In addition to the bank loan, petitioner was the only other source of Queststar's financing. Early in 1984 Donald Woolley, petitioner's son, became involved as a full-time employee of EVM. Donald was advised that there were audit and/or bookkeeping problems with EQI and he set out to resolve the problems. When he visited Los Angeles, Donald found that Tinberg and Sprague were not recording checks or maintaining monthly account statements. Donald, as well as the accountants for EVM, were concerned that it would be difficult to audit EQI for purposes of providing financial statements to lenders. Following some involvement with Queststar and EQI, Donald formed an unfavorable opinion concerning the prospects for the success of Queststar and EQI. He believed that Tinberg and Sprague *159 were not good businessmen and that they did not keep adequate records. Donald also believed that they had failed to make payroll withholding deposits, committed unauthorized acts, and that Sprague desired to obtain control over or access to petitioner's assets. Donald expressed his unfavorable opinion to petitioner and to all her legal and financial advisors. He attempted to convince petitioner that EVM should abandon the EQI enterprise. Failing to convince her, Donald attempted to convince petitioner to remove the Queststar and EQI holdings from EVM and to place the shares in her own name. Donald was concerned that the continued presence of Queststar and EQI on EVM's balance sheet was not good because he believed that Queststar and EQI would never be profitable, Tinberg and Sprague were poor businessmen, and Queststar and EQI's condition could affect EVM's relationship with its creditors or lenders. During these discussions between Donald and petitioner, tax consequences were not discussed. In spite of Donald's advice, petitioner continued to be optimistic throughout the first half of 1984 about Queststar and EQI. During March 1984 the Santa Monica health club was consolidated *160 into the Los Angeles club, which opened in the same month. During meetings on May 31 and June 1, 1984, petitioner, along with Donald, attempted to convince Tinberg and Sprague to relinquish the marketing rights to the equipment so that EQI could perform both the manufacturing and marketing. As an inducement, petitioner offered to contribute up to $ 558,000 in new capital for the following purposes: (a) To pay $ 40,000 in delinquent payroll taxes, (b) to pay $ 103,000 in trade accounts payable, (c) to pay or compromise a $ 190,000 construction lien, (d) to assume an obligation to pay $ 125,000 to the inventor of the equipment, and (e) to lend an additional $ 100,000 to Queststar. Tinberg and Sprague rejected petitioner's offer. On or about June 1, 1984, petitioner agreed to cause the transfer of EVM's 87 shares of EQI to her name in exchange for her payment of $ 5,000 (which was paid June 8, 1984). At this point in time petitioner did not consider the tax consequences. Prior to making the decision to personally own the EQI shares, petitioner had not discussed the tax consequences with any of her tax or financial advisors. The tax consequences first came to her attention when *161 EQI and Queststar's tax returns were being prepared during the fall of 1984. The 1984 sale of stock was not ratified by EVM's shareholders until the October 31, 1986, meeting. On July 17, 1984, EQI applied for and received from respondent on August 16, 1984, "S" corporation status for its short taxable year June 1, 1984, through December 31, 1984. Following the May-June meeting with Tinberg, Sprague, petitioner, and Donald, Eaglet sued petitioner and EVM, and EQI filed a cross-complaint against Eaglet, all during June 1984. During July 1984 a receiver was appointed and during August 1984 the receiver closed the Los Angeles health club. The resulting Queststar receivership eventually terminated in March 1986. Petitioner paid the receiver a $ 63,272 fee in September 1986. Aqua Fitness Equipment, Inc.
Aqua Fitness Equipment, Inc. (Aqua), was formed on September 19, 1984, under the laws of Oregon with 100 shares of common stock which were held by the same people and in the same amount as the shareholders in EQI. Aqua was formed to conduct the weight-lifting equipment business free from the litigation between EQI and Eaglet and because the name Queststar was similar to a name *162 being used by another California business. By an October 1, 1984, agreement, Aqua purchased EQI's operating assets and the debt associated with those assets. The majority of the debt (which was not associated with the transferred assets) remained in EQI. At the time of the purchase, EQI had a $ 710,483 negative net worth reflected in assets with book value of $ 345,912 and liabilities of $ 1,056,395. Aqua then engaged in promotion of the product and petitioner, during 1984, advanced $ 56,500. During 1985 petitioner advanced additional sums to Aqua and at year end Aqua gave petitioner its promissory note for $ 575,925, comprised of new advances and the $ 56,500 from 1984. Petitioner hired a marketing consultant in late 1985 who advised her to abandon the enterprise, but that advice was not followed until March 1986. During 1986 petitioner loaned Aqua $ 206,610. Aqua had negative net worth and its expenses exceeded its income in all periods of operation. Petitioner was successfully sued by the bank on her guarantee of the Queststar loan and judgment was entered against her, EVM, Eaglet, EQI, Queststar, and Sprague for $ 593,981.12, plus costs and disbursements of $ 6,430.90 *163 on July 26, 1985. Subsequently, Sprague was deleted from the judgment and a separate judgment, in the same amount, was entered against him. Petitioner was also awarded a judgment against Sprague in an amount equal to one-half of the judgment in favor of the bank. On January 30, 1987, petitioner paid $ 767,295 in satisfaction of the judgment. Sprague has not satisfied any part of the judgments against him. OPINION The Section 269 Issue
Section 269(a) [2] provides that if any person acquires control of a corporation, and the principal purpose for which such acquisition is made is evasion or avoidance of income tax by securing the benefit of a deduction, credit, or other allowance which such person would not otherwise enjoy, then respondent may disallow such deduction, credit, or other allowance. Section 269(b)(2) (now section 269(c)) authorizes respondent to distribute, apportion, or allocate such deductions, credits, or allowances between corporations, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, if respondent determines that such allowance will not result in evasion or avoidance of the tax. *164 Section 269 applies only if tax evasion or avoidance is the principal purpose for an acquisition. Sec. 1.269-3(a), Income Tax Regs.; Rocco, Inc. v. Commissioner, 72 T.C. 140, 154 (1979); Capri, Inc. v. Commissioner, 65 T.C. 162, 178 (1975). Tax evasion or avoidance is the principal purpose if it exceeds in importance any other purpose. Sec. 1.269-3(a), Income Tax Regs. The determination of the principal purpose in acquiring control of a corporation is a question of fact that depends upon the intent of those who acquire control. Southern Dredging Corp. v. Commissioner, 54 T.C. 705, 718 (1970). Their testimony is of particular importance because the test is one of subjective intent. See Capri, Inc. v. Commissioner, supra at 179; D'Arcy-MacManus & Masius, Inc. v. Commissioner, 63 T.C. 440, 450 (1975). The sole question in dispute is a factual one concerning petitioner's intent and whether the principal purpose for her acquisition was tax avoidance or evasion. Essentially, respondent's argument is that petitioner was generally unaware of the reason(s) she purchased the shares *165 in question and that she was merely following the instructions of her lawyers or advisors, who directed her in an attempt to evade or avoid tax within the meaning of section 269. The main thrust of petitioner's argument emphasizes that petitioner occasionally had a tendency to ignore or not seek the advice of her lawyers or advisors on transactions of various magnitudes. Additionally, she had a tendency to stay in deals to a point where her losses would, in the opinion of her advisors, be unnecessarily increased. Petitioner offered substantial evidence supporting her argument and has effectively shown that tax evasion or avoidance was not a principal purpose, if a purpose at all, for her acquisition of the shares in question. Petitioner, in addition to her own testimony, offered six witnesses who corroborated her statement that she was not motivated by tax considerations in acquiring an interest in EQI. Respondent argues that the witnesses were either family, close business associates, or professional advisors of petitioner. Although we have taken those relationships into consideration, we found the witnesses to be credible and forthright. Additionally, the testimony of petitioner *166 and her witnesses has a general pattern of regularity and is in harmony with all of the evidence in the record. Overall, the evidence in the record portrays petitioner as a self-reliant, independent, and resolute person. Since her husband's death, petitioner has generally managed her family's substantial real estate holdings and the relatively large lumber business. In addition to those endeavors, petitioner initiated or entered into several relatively large business transactions, including a motel complex, a veneer business, and the weight-lifting equipment business. Other than the lumber business and the related realty, petitioner's business decisions have generally resulted in losses. In that connection, it also appears that she did not regularly seek advice or heed her advisors in order to cut losses in these investments. Concerning the investment in EQI, petitioner's actions, as manager of her family's enterprises and her own investments, followed her pattern of not seeking or heeding professional advice or the advice of her family and business associates. We find petitioner to be uniquely independent of professional assistance when considering the relative size and complexity *167 of the matters in which she is involved. Her failure to seek or follow the advice of others may have caused her and her family to experience greater losses than otherwise may have occurred. But her modus operandi has, in the setting of this case, served to assist in convincing the trier of fact that the motivation for acquiring the EQI interest was primarily not to avoid or evade tax. There were valid business reasons for transfer of ownership from the family business entity to petitioner. When petitioner's son, Donald, entered into the business he had a business/accounting background and had professional working experience. He considered the EQI investment and expressed his unfavorable opinion to petitioner and to all her legal and financial advisors. He attempted to convince petitioner that EVM should abandon the EQI enterprise. Failing to convince her, Donald attempted to convince petitioner to remove the Queststar and EQI holdings from EVM and place the shares in her own name. Donald was concerned that the continued presence of Queststar and EQI on EVM's balance sheet was undesirable because he believed that Queststar and EQI would never be profitable, the related business *168 "partners" (Tinberg and Sprague) were poor businessmen, and Queststar's and EQI's condition could affect EVM's relationship with its creditors or lenders. In spite of Donald's advice, petitioner continued her involvement in Queststar and EQI by accepting ownership from EVM. At the time of the acquisition, the enterprise was deeply in debt, and some of that debt had been personally guaranteed by petitioner. After her acquisition, she did not simply fold up the operation and personally seek the tax benefits. Instead, for nearly 2 years after acquisition of the stock, she proceeded to inject more capital into the business and exacerbated her losses, in spite of the advice of her advisors. Clearly, if it was petitioner's plan primarily to seek tax benefits, that does not easily coincide or appear harmonious with the injection of additional capital in a losing proposition. See Arwood Corp. v. Commissioner, T.C. Memo 1971-2. These actions again illustrate petitioner's penchant for independence and ill-advised, unsuccessful business judgment. We find the record quite explicit with respect to the lack of tax motivation in petitioner's actions in acquiring her *169 interest in EQI. There is also controversy over whether Mr. Sheetz (petitioner's certified public accountant) had stated, during the audit, to respondent's revenue agent that petitioner bought the EQI shares and elected subchapter S corporate status for purposes of good tax planning. It does not matter whether that comment was made or not. Mr. Sheetz's credible testimony was to the effect that he did not know that petitioner intended to purchase the EQI shares until after she had purchased them. Obviously, Mr. Sheetz did not advise petitioner if he was unaware of the purchase. The tax-evasion or avoidance motive is determined at the time of acquisition of the shares and not at the time of filing the return, during the audit, or some later date. Rocco, Inc. v. Commissioner, 72 T.C. 140, 156 (1979); Hawaiian Trust Co. Ltd. v. United States, 291 F.2d 761, 766 (9th Cir. 1961). The Basis Issue
Having decided that respondent's determination with respect to section 269 was in error, we now address the issues concerning the amount of the loss to which petitioner is entitled. In connection with her interest in EQI, a subchapter S corporation, *170 petitioner claimed losses which generated net operating loss deductions to other taxable years. In connection with this case, the petitions in these consolidated cases were amended to claim an overassessment for 1982 in the amount of $ 368,102. The claimed overassessment is attributable to advances made during 1984 by petitioner to the Queststar joint venture. Petitioner seeks to claim these advances as part of her claim for an ordinary loss under three alternative theories: (1) The advances should be treated as capital contributions to the Queststar joint venture, rather than loans; (2) the advances should be construed as having been made to EQI; (3) petitioner's personal guarantees of loans to Queststar and her subsequent repayment of the loans to the bank should result in tax deductible basis in Queststar. Petitioner's alternative theories cause us to review the ownership structure of the various entities involved. Petitioner and her family owned EVM which, in turn, owned 87 percent of EQI, which in turn was a 50-percent joint venturer in Queststar. Eaglet, Inc. (owned by Messrs. Sprague and Tinberg), was the other 50-percent joint venturer in Queststar. EQI, EVM, and Eaglet, *171 Inc., are corporate entities, whereas Queststar is a joint venture or partnership with two equal corporate partners. Petitioner, as previously discussed in detail, acquired the 87-percent interest of EVM in EQI, and sometime thereafter converted EQI to a subchapter S corporation for Federal tax purposes. During 1984 petitioner advanced a total of $ 790,000 to or for the benefit of Queststar. Seven hundred and twelve thousand dollars was advanced directly to Queststar and $ 78,000 was advanced to a creditor of Queststar in payment of Queststar's obligation. Petitioner's first argument is that those advances constitute capital contributions rather than loans to Queststar. In this connection, the advances were not made by EQI, the joint venturer, but by petitioner, a shareholder of EQI. Before we can consider whether such a capital contribution would flow through Queststar and then through EQI to petitioner as part of her deductible loss, we must decide whether we can attribute the contribution to EQI even though the payment was made by a non-partner shareholder. Petitioner asks us to look to the substance of this transaction rather than the form to reach the desired conclusion *172 that EQI be entitled to the contribution and that it be included as part of EQI's partner's basis. Petitioner argues that, other than bank loans, she was the major source of capital for all the entities involved. Additionally, petitioner refers us to a partnership case where the Commissioner successfully argued that loans to a partnership, in substance, be considered capital contributions (e.g., equity) because of thin capitalization, thereby generating capital rather than ordinary losses. Hambuechen v. Commissioner, 43 T.C. 90 (1964). Petitioner argues that respondent resists that approach here. Respondent counters that the cited case is distinguishable on its facts. We agree with respondent. In Hambuechen v. Commissioner, supra, the taxpayer was a limited partner, whereas here petitioner's relationship to the partnership (joint venture) was through a corporation which was an equal joint venturer with another corporate entity in the activity. Normally, a subschapter S corporation shareholder is treated like a partner for tax purposes and the corporation, to some extent, becomes a pass-through entity. Secs. 1361 et seq. Losses *173 claimed are limited to a shareholder's adjusted basis in the subchapter S stock and the adjusted basis of any indebtedness of the corporation to the shareholder/taxpayer. Sec. 1366(d)(1)(A) and (B). In the cited case, the "loan" was non-interest-bearing and made without any security under questionable and precarious economic and political circumstances and it was also subordinated to all other creditors of the partnership. Here, petitioner's advances were evidenced by interest-bearing notes and petitioner may have had recourse to the assets of EQI or Eaglet, the partners. So, it is properly classified as a debt interest, not an equity interest. As creditor, petitioner has a $ 3,000 capital loss under section 165. The facts in this case do not fall within the holding of the cited case. Moreover, petitioner and associates created the form of the transactions and should not now be permitted to seek a more favorable result by arguing substance. Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580, 51 L. Ed. 2d 48, 97 S. Ct. 850 (1977); Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 40 L. Ed. 2d 717, 94 S. Ct. 2129 (1974). Next, and in the alternative, petitioner argues *174 that the $ 790,000 in advances to the Queststar joint venture should be treated as contributions to the capital of EQI which would in turn increase petitioner's stock basis in EQI. Concerning this argument, petitioner, citing Enoch v. Commissioner, 57 T.C. 781 (1972), and Rev. Rul. 75-421, 1975-2 C.B. 108, suggests that the situation is analogous to or the correlative of the type of situation where a corporation makes a payment to a shareholder's creditor which is treated as a constructive payment or dividend to the shareholder. We find petitioner's references to be inapposite. Petitioner's argument was addressed, however, in Allen v. Commissioner, T.C. Memo 1988-166. In that case the taxpayer sought to claim losses for an amount paid to or on behalf of a partnership where his interest in the partnership was through shareholdings in a subchapter S corporation which was, in turn, a partner in a partnership. In that case we held that the subchapter S shareholder was not entitled, under section 1374(c)(2), to obtain the benefit of indebtedness added to his basis in the interest he holds in the S corporation because *175 the indebtedness must run directly from the corporation to the shareholder. See Frankel v. Commissioner, 61 T.C. 343, 349 (1973), affd. without published opinion 506 F.2d 1051 (3d Cir. 1974). In the instant case, the loans or advances to or on behalf of the joint venture were essentially the same as those made in Allen v. Commissioner, supra. Here, petitioner's interest in the partnership (joint venture) was through EQI, a subchapter S corporation. Petitioner attempts to factually distinguish Allen by pointing out that: The capital situations were different; the amounts in Allen were smaller and the percentage ownership by taxpayers differed; and the taxpayer in Allen failed to raise an issue concerning the liability of general partners. We do not find these distinctions to make a difference in the outcome of this case, Allen is controlling. Finally, petitioner argues that her personal guarantees and eventual payment of the Queststar joint venture loans should be treated, for tax purposes, as a contribution to the capital of EQI. Here again there is case precedent directly on point holding that guarantees *176 of a subchapter S corporation's loans do not increase the basis of the guaranteeing shareholder. Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989). In view of the foregoing, we hold that petitioner is not entitled to any amount of overassessment for her 1982 taxable year. The Additions to Tax
Respondent determined additions to tax under sections 6653(a)(1) (negligence and intentional disregard of the rules and regulations) and 6661 (substantial understatement). A review of the notices of deficiency reveals that the major, if not the only, substantive adjustment concerned the disallowance, under section 269, of claimed ordinary loss from the questioned transactions. Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the deficiency if any part of the deficiency is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an additional amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable *177 and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934 (1985). Section 6661 imposes an addition to tax for underpayments attributable to substantial understatements of income tax. On additions assessed after October 21, 1986, the rate of the addition is 25 percent of the amount of the underpayment attributable to a substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). Having decided that section 269 is inapplicable here, the additions to tax are not applicable. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years under consideration. Rule references are to this Court's Rules of Practice and Procedure. For each of the four taxable years, sec. 6653(a)(2) will apply to any deficiency redetermined as subject to the addition to tax under sec. 6653(a)(1).↩
2. The pertinent parts of section 269 are as follows: (a) In General. -- If -- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * * * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * * (c) Power of Secretary to Allow Deduction, etc., in Part. -- In any case to which subsection (a) or (b) applies the Secretary is authorized -- * * * (2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; * * *↩